2004 UT App 34

**B.A.M. DEVELOPMENT, L.L.C., a Utah limited liability company, Plaintiff and Appellant,**

v.

**SALT LAKE COUNTY, a Utah body politic and political subdivision of the State of Utah, Defendant and Appellee.**

No. 20010840–CA.

Court of Appeals of Utah.

Feb. 20, 2004.

Rehearing Denied April 8, 2004.

Stephen G. Homer, West Jordan, for Appellant.

Donald H. Hansen, Salt Lake County Attorney's Office, Salt Lake City, for Appellee.

Before Judges BENCH, ORME, and THORNE, JJ.

OPINION

THORNE, Judge:

¶ 1 B.A.M. Development, L.L.C. (BAM), appeals from a district court decision finding

that no unconstitutional taking occurred when Salt Lake County (the County) required BAM to dedicate additional land as a condition of subdivision approval. We reverse and remand.

## BACKGROUND

¶ 2 In 1997, BAM sought to develop a subdivision located at 7755 West 3500 South in Salt Lake County, Utah. The Salt Lake County Planning and Zoning Commission (the Commission) granted preliminary approval for the proposed subdivision. In the original subdivision plat, BAM agreed to dedicate a forty-foot strip of land in anticipation of 3500 South being widened. In April 1998, the County informed BAM that after consulting with the Utah Department of Transportation (UDOT), the County had determined that BAM must dedicate an additional thirteen-foot strip of land abutting 3500 South in anticipation of future road expansion. BAM objected to the increase because it had already drafted and divided the subdivision plots utilizing the forty-foot dedication.[1] BAM argued that increasing the dedication to fifty-three feet would alter several plots dramatically and would require reconfiguration of the subdivision at great expense. Without receiving any evidence, the Commission denied BAM's license to develop their subdivision without the fifty-three-foot dedication.

¶ 3 BAM appealed to the Salt Lake County Board of Commissioners (the Board), by filing a "Notice of Claim" with the Board. In this Notice of Claim, BAM claimed that "[t]he uncompensated dedication and improvement of the additional roadway constitute[d] an unconstitutional 'taking,' not reasonably justified by the actual impact created by the proposed development." Without conducting a hearing, taking evidence, or is-

suing findings, the Board upheld the Commission's decision.

¶ 4 BAM then filed suit in district court claiming that the County's demand was unconstitutional because it was not roughly proportional, as required by *Dolan v. City of Tigard*, 512 U.S. 374, 391, 114 S.Ct. 2309, 2319–20, 129 L.Ed.2d 304 (1994). After trial, the district court found in favor of the County, concluding that the rough proportionality test did not apply. BAM objected to the district court's findings of fact and conclusions of law and filed a motion for a new trial. The district court overruled BAM's objections and denied its motion for a new trial. BAM appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 5 BAM argues that the County's dedication requirement of thirteen additional feet constitutes a taking of its land without just compensation, in violation of the United States Constitution.[2] However, we must first determine whether the district court acted properly when it received evidence and then ruled on the constitutionality of the land-dedication requirement. Resolution of this issue requires statutory interpretation, which we review for correctness. *See Valley Colour Inc. v. Beuchert Builders Inc.*, 944 P.2d 361, 363 (Utah 1997) (noting that " '[i]n matters of pure statutory interpretation, an appellate court reviews a trial court's ruling for correctness and gives no deference to its legal conclusions' " (citations omitted)).

## ANALYSIS

¶ 6 The County Land Use Development and Management Act, *see* Utah Code Ann. § 17–27–101 to –1003 (2001), authorizes counties "to enact all ordinances, resolutions, and

---

1. Below, BAM argued that "[t]he uncompensated dedication and improvement of the *additional* roadway constitutes an unconstitutional 'taking,' not reasonably justified by the actual impact created by the proposed development." (Emphasis added.) Thus, BAM did not challenge the dedication of the first forty feet of land and has waived review of that portion of the dedication.

2. BAM also argued that the County violated Utah's constitutional protections of Equal Protec-

tion and Uniform Operation of Laws. However, because we find that the district court misinterpreted Utah Code Annotated section 17–27–1001 (2001) and received evidence in this case when it should have found the Board's treatment of BAM's takings claim to be arbitrary and capricious, and we remand on that basis, we need not address the takings question or the other issues raised by BAM.

rules that they consider necessary for the use and development of land within the county ... unless ... expressly prohibited by law." *Id.* § 17–27–102(1).[3] If a landowner disagrees with a county land use decision, that landowner can appeal the decision, pursuant to Utah Code Annotated section 17–27–1001. Section 17–27–1001(3)(a) provides that when a county's land use decision is appealed to the district court, that court shall "presume that land use decisions and regulations are valid; and ... *determine only whether or not the decision is arbitrary, capricious, or illegal.*" *Id.* (emphasis added).[4] "A determination of illegality requires

a determination that the decision violates a statute, ordinance, or existing law." Utah Code Ann. § 17–27–1001(3)(b).

■ ¶ 7 While no Utah Court has specifically addressed the standard of review applicable to appeals brought pursuant to section 17–27–1001, we have addressed the standard of review for appeals taken pursuant to Utah Code Annotated section 17–27–708 (2001), which contains language similar to that of section 17–27–1001.[5] *Compare* Utah Code Ann. § 17–27–708, *with id.* § 17–27–1001. In the absence of any case law interpreting section 17–27–1001, we, by analogy, rely upon case law interpreting section 17–27–708.[6]

3. We cite to the most recent version of the statute for convenience. However, all amendments relevant to this opinion will be noted.

4. Utah Code Annotated section 17–27–1001 provides, in relevant part:
    (1) No person may challenge in district court a county's land use decisions made under this chapter or under the regulation made under authority of this chapter until that person has exhausted all administrative remedies.
    (2) (a) Any person adversely affected by any decision made in the exercise of the provisions of this chapter may file a petition for review of the decision with the district court within 30 days after the local decision is rendered.
    ....
    (3) (a) The courts shall:
        (i) presume that land use decisions and regulations are valid; and
        (ii) determine only whether or not the decision is arbitrary, capricious, or illegal.
    (b) A determination of illegality requires a determination that the decision violates a statute, ordinance, or existing law.
    Utah Code Ann. § 17–27–1001(1), (2)(a),-(3)(a)(b) (2001).

5. Utah Code Annotated section 17–27–708 provides, in relevant part:
    (1) Any person adversely affected by any decision of a board of adjustment may petition the district court for a review of the decision.
    (2)(a) *The district court's review is limited to a determination of whether the board of adjustment's decision is arbitrary, capricious, or illegal.*
        (b) A determination of illegality requires a determination that the board of adjustment's decision violates a statute, ordinance, or existing law.
    ....
    (4)(a) The board of adjustment shall transmit to the reviewing court the record of its proceedings including its minutes, findings, orders

and, if available, a true and correct transcript of its proceedings.
    ....
    (5)(a) ...
        (i) *If there is a record, the district court's review is limited to the record provided by the board of adjustment.*
        (ii) *The court may not accept or consider any evidence outside the board of adjustment's record unless that evidence was offered to the board of adjustment and the court determines that it was improperly excluded by the board of adjustment.*
        (b) *If there is no record, the court may call witnesses and take evidence.*
    (6) The court shall affirm the decision of the board of adjustment if the decision is supported by substantial evidence in the record.
    Utah Code Ann. § 17–27–708, (1), (2)(a), (4)(a). (5)(a), (5)(b), (6) (2001) (emphasis added).

6. We acknowledge that the analogy to section 17–27–708 is not perfect. For example, section 17–27–708(5)(b) authorizes the district court to call witnesses and receive evidence if no record was made below, *see id.* § 17–27–708(5)(b), or if on review the district court determines that the Commission erroneously excluded evidence. *See id.* § 17–27–708(5)(a)(ii). In contrast, section 17–27–1001 does not authorize the district court to receive evidence or call witnesses. However, this distinction merely strengthens our position that the district court erred in receiving evidence. In the case of section 17–27–1001, the legislature did not authorize the district court to receive evidence even though it had done so in other situations. *See* Utah Code Ann. § 17–27–708(5)(b). "[W]e" "presume that the legislature used each word advisedly and [we] give effect to the term according to its ordinary and accepted meaning." ' " *Department of Natural Res. v. Huntington–Cleveland Irrigation Co.*, 2002 UT 75, ¶ 13, 52 P.3d 1257 (citations omitted). Accordingly, we conclude that section 17–27–1001 does not authorize the district court to receive evidence. Instead, the district court can only review the record made before the County.

¶ 8 In *Patterson v. Utah County Bd. of Adjustment*, 893 P.2d 602 (Utah Ct. App.1995), landowners sought a "special exception under a county zoning ordinance." *Id.* at 603. The county conducted a hearing, received evidence, and then granted the exception. *See id.* Pursuant to section 17–27–708, another landowner appealed the decision to the district court, where the county's actions were found to be "arbitrary, capricious, and illegal." *Patterson*, 893 P.2d at 603. The matter was then appealed to this court. *See id.* On appeal, the parties attempted to introduce new evidence. *See id.* at 610–11. We concluded, because the board of adjustments had conducted a hearing and received evidence, that we were limited to the existing record. *See id.* at 604. In reaching this conclusion, we stated:

> Since the district court's review of the Board's decision was limited to a review of the Board's record, we do not accord any particular deference to the district court's decision. Instead, we review the Board's decision as if the appeal had come directly from the agency. Thus, the standard for our review of the Board's decision is the same standard established in the Utah Code for the district court's review.
>
> . . . .
>
> In determining whether substantial evidence supports the Board's decision we will consider all the evidence in the record, both favorable and contrary to the Board's decision. Nevertheless, our review, like the district court's review, "is limited to the record provided by the board of adjustment.... The court may not accept or consider any evidence outside the board['s] record...." We must simply determine, in light of the evidence before the Board, whether a reasonable mind could reach the same conclusion as the Board. It is not our prerogative to weigh the evidence anew.

*Id.* at 603–04 (citations and footnotes omitted.) [7]

---

Next, the dissent incorrectly claims that *Sandy City v. Salt Lake County*, 827 P.2d 212 (Utah 1992), prohibits our analogy to section 17–27–708. In *Sandy City*, the Utah Supreme Court cautioned against the use of statutes relating to cities in county-land-use appeals. *See id.* at 220. The court noted that " 'the respective statutes dealing with cities and counties confer different powers.' " *Id.* (citations omitted). The court further noted, in a footnote, that in the earlier appeal to the Utah Court of Appeals, we had erroneously relied on a municipal statute, had applied an incorrect standard of review, and had limited our review to the administrative record. *See id.* n. 4.

In *Sandy City*, no statute governed appeals from county land-use decisions. *See id.* In contrast, here, section 17–27–1001 sets forth this court's standard of review-whether the county's action was "arbitrary, capricious, or illegal." Utah Code Ann. § 17–27–1001(5)(b). Furthermore, in *Sandy City*, this court erroneously applied a municipal standard of review to a county land-use decision. *See Sandy City*, 827 P.2d at 220 n. 4. Here, contrary to the dissent's claim, we do not substitute section 17–27–708 for section 17–27–1001. Instead, we simply look to cases interpreting similar language to determine how the legislature intended courts to review county land use decisions.

Next, the dissent implies that we apply the standard of review set forth in section 17–27–708, while ignoring section 17–27–1001. We do not substitute the standard of review in section 17–27–708 for the one in section 17–27–1001. Instead, because of an absence of clear guidance by the legislature, we merely refer to section 17–27–708 by analogy because both statutes limit the district court's review to whether the county's decision is "arbitrary, capricious, or illegal." *Compare* Utah Code Ann. § 17–27–708(2)(a), *with id.* § 17–27–1001(3)(a).

Finally, the dissent makes much of the "County's concession in its brief that 'BAM followed the appeal procedure outlined in the Utah Statutes and corresponding Salt Lake County Ordinance provision[s].' " We agree. However, our focus is not on whether BAM followed the correct procedure, but whether the district court exceeded the scope of its authority pursuant to section 17–27–1001 when it received evidence in this case. Any "concession" made by BAM has no bearing on the propriety of the district court's actions.

7. In *Patterson v. Utah County Bd. of Adjustment*, 893 P.2d 602 (Utah Ct.App.1995), we determined that appellate courts were bound by the record before the board of adjustments. *See id.* at 604. However, *Patterson* did not address the import of section 17–27–708(5)(b), which allows the district court to receive evidence if no record was made below. *See* Utah Code Ann. § 17–27–708(5)(1) (2001). Still, *Patterson* provides some guidance regarding how we should review appeals pursuant to section 17–27–1001, because it addresses a situation, like the one here, when the appellate court cannot receive evidence and can only determine, on the record before it, whether the administrative agency acted arbitrarily, capriciously, or illegally. *See Patterson*, 893 P.2d at 604.

¶ 9 Here, neither the Commission, nor the Board, received evidence on whether the County's requirement of an additional thirteen feet was a "taking." Instead, both approved the County's action without a hearing. Consequently, the district court had no record to review. The lack of a record apparently prompted the district court to receive evidence and determine for itself whether the County had unconstitutionally taken BAM's property. However, the plain language of section 17–27–1001 does not authorize the district court to receive evidence. *See* Utah Code Ann. § 17–27–1002(3)(a).[8] Thus, we conclude that the district court is limited to the record made before the County and can determine only whether the County's decision was "arbitrary, capricious, or illegal." *Id.* § 17–27–1001(3)(a)(ii); *see also Wilcox v. CSX Corp.*, 2003 UT 21,¶ 8, 70 P.3d 85 (noting that courts first look to the plain language of a statute and only look beyond the plain language if there is an ambiguity).[9]

¶ 10 The absence of a record in this case is highly problematic, because historically, takings determinations are mixed questions of law and fact. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1071, 112 S.Ct. 2886, 2922, 120 L.Ed.2d 798 (1992) (Blackmun, J., dissenting) (noting that whether government action has deprived a claimant of his property without just compensation is an "essentially [an] ad hoc, factual inquir[y]"). Moreover, Utah courts also have acknowledged that evaluating the reasonableness of an exaction is a fact-intensive inquiry.

¶ 11 In *Home Builders Ass'n v. City of American Fork*, 1999 UT 7, 973 P.2d 425, the Utah Supreme Court stated that "[exactions,] such [as] fees[,] are constitutionally permissible if the benefits derived from their exaction are 'of "demonstrable benefit" to the subdivision,' and if newly developed properties are not required to bear more than their equitable share of the capital costs in relation to the benefits conferred." *Id.* at ¶ 14 (quoting *Banberry Dev. Corp. v. South Jordan City*, 631 P.2d 899, 905 (Utah 1981) (additional citation omitted)). In assessing the reasonableness of an exaction, a fact finder may consider, among other factors

(1) the cost of existing capital facilities; (2) the manner of financing existing capital facilities (such as user charges, special assessments, bonded indebtedness, general taxes, or federal grants); (3) the relative extent to which the newly developed properties and the other properties in the municipality have already contributed to the cost of existing capital facilities (by such means as user charges, special assessments, or payment from the proceeds of general taxes); (4) the relative extent to which the newly developed properties and the other properties in the municipality will contribute to the cost of existing capital facilities in the future; (5) the extent to which the newly developed properties are entitled to a credit because the municipality is requiring their developers or owners (by contractual arrangement or otherwise) to provide common facilities (inside or outside the proposed development) that have been provided by the municipality and financed through general taxation or other means (apart from user charges) in other parts of the municipality; (6) extraordinary costs, if any, in servicing the newly developed properties; and (7) the time-price differential inherent in fair comparisons of amounts paid at different times.

*Id.* at ¶ 5 (quoting *Banberry*, 631 P.2d at 903–04). This list, while not exhaustive, illustrates that the determination of whether an exaction is reasonable is a fact-intensive inquiry.

---

8. The dissent argues that even if we were to apply section 17–27–708 to the instant appeal "it would not change the result." We do not advocate the substitution of section 17–27–708 for section 17–27–1001. Instead, we simply refer to case law interpreting section 17–27–708 to support our conclusion that the district court's role in this case is limited to determining whether the Board acted arbitrarily, capriciously, or illegally in summarily denying BAM's taking claim.

9. The dissent spends considerable time discussing the differences between board of adjustments and county commissions. We acknowledge the distinction between these two bodies, but note that review from both is limited to whether the decision was arbitrary, capricious, or illegal. This similarity is the basis for our analogy to section 17–27–708.

¶ 12 Here, the absence of a record at the administrative level prevented the district court from evaluating the propriety of the Board's action as directed by Utah Code Annotated section 17–27–1001(3)(a). We conclude that the district court erred when it received evidence on BAM's taking claim. The district court should have, instead, determined that the Board, in the absence of an adequate factual record, acted arbitrarily and capriciously in deciding BAM's takings claim.

¶ 13 Thus, we reverse the district court's decision and remand the case directing the district court to enter a judgment that the Board acted arbitrarily and capriciously when it failed to conduct a hearing on BAM's takings claim. The district court should then remand the case to the proper county agency, directing that agency to conduct a proper hearing on BAM's takings claim.[10]

¶ 14 However, because we anticipate that a county body will have to determine the constitutionality of the exaction, we provide some guidance regarding the proper standard to apply. BAM argues that its property has been taken without just compensation.

> The Takings Clause, which applies to the states through the Fourteenth Amendment, declares: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. One of the Clause's primary purposes is " 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' "

*Smith Inv. Co. v. Sandy City*, 958 P.2d 245, 257 (Utah Ct.App.1998) (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 384, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994)). One type of "taking" associated with subdivision approval is a "development exaction."

> [D]evelopment exactions may be defined as contributions to a governmental entity imposed as a condition precedent to approving the developer's project. Usually, exactions are imposed prior to the issuance of a building permit or zoning/subdivision approval. Development exactions may take the form of: (1) mandatory dedications of land for roads, schools or parks, as a condition to plat approval, (2) fees-in-lieu of mandatory dedication, (3) water or sewage connection fees, and (4) impact fees.

*Salt Lake County v. Board of Educ.*, 808 P.2d 1056, 1058 (Utah 1991) (quotations and citations omitted); *see also* No. 13 Richard R. Powell, *Powell on Real Property*, § 79D.04[2][a], 295–96, (Michael Allan Wolf ed., 2003) (noting that "exactions" are generally sought through several methods: (1) land dedication requirements, (2) land dedication requirement with fee option, (3) impact fees, or (4) in-kind exactions). In *Dolan v. City of Tigard*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) and *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), the United States Supreme Court developed a two-part test for determining whether a particular developmental exaction violated the takings clause of the United States Constitution.

¶ 15 In *Dolan*, the Court concluded that for a development exaction to be constitutional, the government must show an " 'essential nexus' . . . between the 'legitimate state interest' " and the land dedication requirement. 512 U.S. at 386, 114 S.Ct. at 2317 (citation omitted). The Court further explained that to succeed the government "must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.* at 391, 114 S.Ct. at 2319–

---

**10.** Effective in 2000, Salt Lake County substantially changed its governmental structure. Prior to the change, the County was governed by three County Commissioners. We remand this case directing the district court to order a hearing on BAM's takings claim. However, in light of the change in county structure, remand to the Board of Commissioners is impossible. Thus, the district court must also determine which Salt Lake County governmental body should consider BAM's takings claim.

The dissent attacks this approach as "repugnant to the important principles of judicial economy." While we admit that in this case it might be quicker to ignore the appropriate standard of review and address the merits of this case, we would do so in direct opposition to the mandate of Utah Code Annotated section 17–27–1001. The more appropriate approach is to balance the desire for judicial economy against the need for judicial restraint. In this case, as in most cases, judicial restraint should, and does, prevail.

20. The Court labeled this examination a "rough proportionality" test. *Id.* at 391, 114 S.Ct. at 2319.

¶ 16 Here, BAM was required to dedicate thirteen additional feet of land that abutted 3500 South before the County would approve its subdivision plat. We conclude that this constitutes a developmental exaction as described in *Nollan* and *Dolan.* Accordingly, the *Nollan/Dolan* "rough proportionality" test applies in this case. Therefore, upon remand, the reviewing body must determine: (1) whether requiring the exaction serves a legitimate government interest, and (2) whether there is a " 'rough proportionality' " between the exaction and the "impact of the proposed development." *Dolan,* 512 U.S. at 391, 114 S.Ct. at 2319–20; *see also* No. 13 Richard R. Powell, *Powell on Real Property,* § 79D.04[2][a], 295–96, (Michael Allan Wolf ed., 2003).[11]

## CONCLUSION

¶ 17 We conclude that the district court exceeded its authority when it conducted a hearing and received evidence on BAM's takings claim contrary to the limits established in Utah Code Annotated section 17–27–1001(3)(a). The district court should have concluded that the Board acted arbitrarily and capriciously in deciding BAM's taking issue without conducting a hearing. Accordingly, we reverse the district court's decision, and remand directing the district court to set aside the Board's determination. The district court shall then identify the proper body to conduct a full hearing on the merits and remand the case to that body.

¶ 18 I CONCUR: RUSSELL W. BENCH, Judge.

ORME, Judge (dissenting):

¶ 19 With neither party having so argued, it is perplexing that the majority insists on analyzing the propriety of the trial court's actions under Utah Code Ann. § 17–27–708 (2001), while at the same time admitting that this appeal is governed by Utah Code Ann. § 17–27–1001 (2001). I disagree with this approach and the remedy of starting over before an entity of county government yet to be selected by the trial court. This result is especially disturbing given the County's concession in its brief that "BAM followed the appeal procedure outlined in the Utah statute and corresponding Salt Lake County Ordinance provision[s]."

¶ 20 Under both sections 17–27–708 and 17–27–1001, judicial review "is limited to a determination of whether the [challenged] decision is arbitrary, capricious, or illegal." Utah Code Ann. § 17–27–708(2)(a). *See* Utah Code Ann. § 17–27–1001(3)(a)(ii). However, section 17–27–708 restricts the trial court's authority to take evidence, while section 17–27–1001 does not. By its own terms, section 17–27–708 applies only to trial court review of "any decision of a board of adjustment." *Id.* § 17–27–708(1). BAM's appeal was not, of course, from a decision of a board of adjustment, but from a decision of the Salt Lake County Board of Commissioners. This distinction is significant, given the very limited purview of a board of adjustment's powers and duties, which, at the time of BAM's appeal to the County Commission, was to "hear and decide ... appeals from *zoning* decisions applying the *zoning* ordinance[,] special exceptions to the terms of the *zoning* ordinance[, and] variances from

---

**11.** In *Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), the United States Supreme Court announced for the first time a "rough proportionality" test to apply when evaluating the constitutionality of exactions. *Id.* at 391, 114 S.Ct. at 2319. In *Dolan,* the Court acknowledged that the majority of states have adopted a "reasonable relationship" test. *Id.* The Court concluded that the "reasonable relationship" test was "close[ ] to the federal constitutional norm." *Id.* However, the Court declined to adopt the phrase "reasonable relationship" because of its similarity to the phrase "rational basis." *Id.* In all other respects, it

appears that the Court adopted a "reasonable relationship" test and simply renamed it the "rough proportionality" test.

Utah has also applied the "reasonable relationship" test when evaluating the constitutionality of an exaction. *See, e.g., Home Builders Ass'n v. City of Am. Fork,* 1999 UT 7, ¶ 14–16, 973 P.2d 425 (applying the "reasonable relationship" test to a real estate development fee); *Banberry Dev. Corp. v. South Jordan City,* 631 P.2d 899, 905 (Utah 1981) (applying the " 'reasonable relationship' " test to a subdivision impact fee (citation omitted)).

the terms of the *zoning* ordinance." Utah Code Ann. § 17–27–703(1)(a)–(c) (1995) (emphasis added).[1] The Salt Lake County zoning ordinances, contained in Title 19 of the Salt Lake County Code of Ordinances, are not relevant to this appeal. Rather, this appeal contests the County's power to require highway dedication from abutting property owners under Title 15 of the Salt Lake County Code of Ordinances. Understanding the difference in function between a board of adjustment and a county commission goes a long way in demonstrating that there is a rational basis for the distinction between section 17–27–708, applicable only to judicial review of board of adjustment decisions, and section 17–27–1001, applicable to land use decisions generally. Such an understanding dispels any notion that the Legislature meant to include section 17–27–708's restriction in section 17–27–1001, but just forgot to say so, or that, on some other basis, the restriction should be grafted onto section 17–27–1001.

¶ 21 Boards of adjustment are adjudicative bodies—they take sworn testimony and compel the attendance of witnesses, *see id.* § 17–27–702(3); they keep records of their proceedings, *see id.* § 17–27–702(4)(b)(ii); and they may even choose to make their record with the same completeness as a district court, i.e., by means of a court reporter or tape recorder. *See id.* § 17–27–702(4)(c). In sharp contrast, county commissions are not, first and foremost, adjudicative bodies and thus are not positioned to generate the kind of record that a board of adjustment will. Thus, a restriction on judicial roving into the evidentiary realm in the case of a board of adjustment decision makes sense: There should already be an adequate record. However, in contrast, it makes no sense to pre-clude a court from taking evidence where a county commission has made the decision under attack because no equivalent record will ordinarily have been made by the county commission.[2] Therefore, the general provision set forth in section 17–27–1001 controls, not the provision limited, by its own terms, to boards of adjustment.

¶ 22 The majority argues that the language in section 17–27–708 "strengthens [its] position that the district court erred in receiving evidence" because section 17–27–1001 is silent on the matter. Specifically, section 17–27–708(5)(a)(ii)–(b) states: "The [trial] court may not accept or consider any evidence outside the board of adjustment's record *unless* that evidence was offered to the board of adjustment and the court determines that it was improperly excluded by the board of adjustment [or] there is no record." *Id.* (emphasis added). The logic of the majority's argument is flawed. Section 17–27–708 restricts the trial court's authority to take evidence unless one of the two enumerated exceptions applies. Section 17–27–1001, however, contains no such restriction. Without the restriction, there is no hindrance to the trial court's receiving evidence. *See Biddle v. Washington Terrace City,* 1999 UT 110, ¶ 14, 993 P.2d 875 ("[O]missions in statutory language should 'be taken note of and given effect.' ") (quoting *Kennecott Copper Corp. v. Anderson,* 30 Utah 2d 102, 514 P.2d 217, 219 (1973)). Indeed, if silence meant the trial court cannot consider evidence in the absence of express authorization, there would simply be no reason for the restriction expressed in section 17–27–708—it would already be the case that evidence could not ordinarily be received by the reviewing court.

1. The powers and duties of the board of adjustment have since been expanded. *See* Utah Code Ann. § 17–27–703 (2001).

2. Prior cases have distinguished boards of adjustment from local legislative bodies, both at the county level, *see Toone v. Weber County,* 2002 UT 103, ¶ 7, 57 P.3d 1079 (recognizing that section 17–27–707, for example, "grant[s] boards of adjustment limited power to grant zoning variances"); *Levie v. Sevier County,* 617 P.2d 331, 333 (Utah 1980) (stating that "the *County Commission* is charged with the responsibility for approving *subdivision plats*—not the Board of Adjustment") (emphasis in original), and at the municipal level. *See Bradley v. Payson City Corp.,* 2003 UT 16, ¶ 13, 70 P.3d 47 ("[A] board of adjustment is a quasi-judicial body designed only to correct specific zoning errors."); *Harmon City, Inc. v. Draper City,* 2000 UT App 31, ¶ 16, 997 P.2d 321 (noting that "[t]he distinction between quasi-judicial decisions of a board of adjustment as opposed to legislative municipal zoning decisions is significant: boards of adjustment have no legislative powers and are not permitted to have those powers").

¶ 23 Significantly, this court has previously relied on a statute applicable to a board of adjustment decision in an appeal stemming from a planning commission decision, only to have our error corrected by the Utah Supreme Court. In *Sandy City v. Salt Lake County*, 794 P.2d 482 (Utah Ct.App.1990) (*Sandy City I*), rev'd, 827 P.2d 212 (Utah 1992) (*Sandy City II*), this court applied former section 10–9–15,[3] the municipal analogue to current section 17–27–708, to an appeal stemming from an action of the Salt Lake County Planning Commission. *See Sandy City I*, 794 P.2 at 486. In so doing, this court stated that its review was limited to the administrative record. *See id.* The Utah Supreme Court called attention to our error in *Sandy City II*, indicating that "the court of appeals [mistakenly] confined its review to the administrative record," because, "[f]irst, section 10–9–15 applies only to municipalities, not to counties[, and s]econd, section 10–9–15 applies only to relief sought from the actions of the board of adjustment, not from the actions of the planning commission or the board of county commissioners." 827 P.2d at 220 n. 4. Interestingly, the Court also noted that, "[a]t the time [*Sandy City I* was decided], no analogous statute regulated legal grievances arising from the actions of Salt Lake County or the planning commission; consequently, there was no basis for the court of appeals to confine its review to the administrative record." *Sandy City II*, 827 P.2d at 220 n. 4.

¶ 24 Contrary to the law in existence at the time *Sandy City I* was decided, we *do* now have a statute that controls appeals from land use decisions of the Salt Lake County Board of Commissioners—section 17–27–1001. If it is improper to apply a statute applicable to actions of a board of adjustment even when there is no comparable statute governing appeals from another governmental body, it seems axiomatic that it would be improper to do so when there is such a statute.

¶ 25 But even if it were somehow proper to analyze the trial court's actions under section 17–27–708, it would not change the approach in the instant appeal. As the majority recognizes, a trial court may not "accept or consider any evidence outside the board of adjustment's record" under section 17–27–708 unless: (1) there is no record, *see id.* § 17–27–708(5)(b), or (2) "evidence was offered to the board of adjustment and the court determines that it was improperly excluded." *Id.* § 17–27–708(5)(a)(ii). Because there was no record made in connection with BAM's appeal to the Salt Lake County Board of Commissioners, the instant case fits squarely within the exception enumerated in section 17–27–708(b).[4] Therefore, even if we do look to section 17–27–708 in analyzing the trial court's actions, as the majority urges, the court properly called witnesses and took evidence, which evidence is properly now part of our record. *See Xanthos v. Board of Adjustment*, 685 P.2d 1032, 1034 (Utah 1984) (" 'The nature and extent of [judicial] review depends on what happened below as reflected by a true record of the proceedings' [before the board of adjustment. Thus], if the hearing had proceeded in accordance with due process requirements, the reviewing court could look only to the record, but where it had not *or where there was nothing to review*, the reviewing court must be al-

---

3. That section provided, in relevant part, that "any person aggrieved by any decision of the board of adjustment may have and maintain a plenary action for relief therefrom in any court of competent jurisdiction." Utah Code Ann. § 10–9–15 (1986).

4. It is curious, then, that the majority cites *Patterson v. Utah County Board of Adjustment*, 893 P.2d 602 (Utah Ct.App.1995), in support of its proposition that the trial court erroneously received evidence in the instant case. As the majority recognizes, the board of adjustment in *Patterson* conducted a hearing and received evidence. *See id.* at 603. Therefore, pursuant to section 17–27–708, a reviewing court could not receive additional evidence in that case unless it determined that such evidence "was improperly excluded by the board." Utah Code Ann. § 17–27–708(5)(a)(ii). BAM's appeal, on the other hand, was summarily denied by the Salt Lake County Board of Commissioners, whose response consisted entirely of the following statement: "The Board of County Commissioners, at its meeting held this day, upheld the planning commission approval and denied the request of B.A.M. Development, Inc., for an appeal on PL–97–1063, Westridge Meadows 7755 West 3500 South." *Patterson*, then, is quite unlike the case before us.

lowed to get at the facts.") (emphasis added) (decided under former section 10–9–15). *Accord Davis County v. Clearfield City,* 756 P.2d 704, 709–10 (Utah Ct.App.), *cert. denied,* 765 P.2d 1278 (Utah 1988).

¶ 26 Accordingly, the appeal is ripe for decision by this court and, in my view, it should be resolved at this juncture.[5] If I were writing the opinion for the court, I would write as follows:

\* \* \*

¶ 27 Plaintiff B.A.M. Development, L.L.C. (BAM) appeals the trial court's decision holding that Defendant Salt Lake County (the County), acting pursuant to its Transportation Master Plan, could constitutionally require BAM to dedicate a fifty-three-foot right-of-way, without compensation, as a condition to approval of BAM's subdivision proposal. The trial court's decision should be reversed and remanded.

## BACKGROUND [6]

¶ 28 Salt Lake County Ordinance 15.28.010, enacted under authority of Utah Code Ann. § 17–27–801 (2001), requires dedication and improvement of public street right-of-way space by developers of abutting property in accordance with the County's Transportation Master Plan. The Transportation Master Plan is based on traffic projections and recommendations from the Wasatch Front Regional Council and the Utah Department of Transportation (UDOT), including a long-range transportation study projecting highway capacity needs in Salt Lake County to the year 2020.

¶ 29 In July of 1997, BAM submitted a proposal to develop Westridge Meadows subdivision on a fifteen-acre parcel at approximately 7700 West 3500 South in unincorporated Salt Lake County. BAM's fee simple interest in the parcel proposed for subdivi-

sion development extended to the center line of 3500 South Street at its northern boundary. Pursuant to Salt Lake County Ordinance 15.28.010, BAM's proposed plat indicated a forty-foot half-road-width dedication at 3500 South Street, running along the northern boundary of BAM's adjacent property. The dedication was to be used for the eventual widening of 3500 South, a state highway abutting the proposed subdivision. 3500 South is a thoroughfare used by the traveling public, which will also be used by future subdivision residents, although the highway is not directly accessible from the subdivision.

¶ 30 On September 9, 1997, the County approved BAM's subdivision proposal subject to compliance with County ordinances and departmental requirements in these terms:

1. Construction of curb, gutter, sidewalk and street improvements on proposed and adjoining streets including 3500 South (sidewalk on 3500 South to be 6' wide and placed next to the fence).

2. Elimination, relocation, piping, or fencing open ditches and/or canals within or adjacent to the subdivision by subdivider as agreeable to irrigation users or company.

3. Construction of a 6' high non-climbable barrier fence along 3500 South as these lots are non-vehicular access to 3500 South. A gate is to be constructed on each lot for property owner access and this note to be on Mylar.

4. Dedication of 40' from the center line of 3500 South to Salt Lake County for street right-of-way.

5. Modification of design as worked out by County Departments and subdivider.

6. Final plat to be drawn on a subdivision mylar by a licensed surveyor.

7. Street on west to be dedicated and constructed with curb and gutter on

---

5. This sound approach, fully consistent with the plain language of the statutory sections analyzed, also advances the cause of avoiding inefficiency, duplication, and delay. Considerable court resources have already been expended on this case, resulting in a two-day bench trial which produced a voluminous record. It has been briefed and argued to this court and, as will be obvious, has been the object of much deliberation and

analysis. Remanding this case to the trial court, with instructions to send it back to the County to repeat the fact-finding process, is repugnant to the important principle of judicial economy.

6. This opinion borrows liberally from the trial court's Findings of Fact.

west side and curb, gutter & sidewalk on east side.

8. Comply with all conditions of the .2 overpressure zone. This note to be on mylar.

9. A minimum 15′ wide landscaping area to be installed along 3500 South. The landscape strip to be maintained by the adjacent property owner. Plan to be approved by Development Services Staff.

10. Install traffic calming devices as approved by Transportation Engineer.

¶ 31 On September 15, 1997, UDOT received BAM's subdivision proposal. UDOT responded that the current required highway dedication for 3500 South at the location of BAM's proposed subdivision was a fifty-three-foot half-road-width right-of-way, not forty feet, as indicated by the County's Transportation Master Plan. In June of 1998, the County incorporated the revised right-of-way requirement of fifty-three feet into its Transportation Master Plan. That same month, the County granted preliminary approval of BAM's subdivision proposal subject to compliance with, among other things, the fifty-three-foot right-of-way dedication.[7]

¶ 32 On July 2, 1998, BAM filed a notice of appeal with the Salt Lake County Board of Commissioners, challenging the constitutionality of the County's requirement of a fifty-three-foot dedication and the resulting "increased expenses" and requesting approval of the subdivision proposal with a forty-foot dedication. The Board of County Commissioners summarily denied BAM's appeal, and BAM filed suit against the County in district court, alleging, among other things, that the County's development exactions were "unreasonable and excessive" and effected a taking of BAM's property without just compensation. After a two-day bench trial, the trial court entered judgment in favor of the Coun-

ty on all counts, concluding that, inter alia, "BAM failed to establish a cause of action on its 'takings' claim." The trial court subsequently denied BAM's "Motion for Entry of New Findings and/or Additional Findings" and its "Motion for a New Trial," and BAM appealed to this court.

¶ 33 While the above litigation was in process, the County approved BAM's amended subdivision plat, which had been modified, under protest, to include the required fifty-three-foot highway dedication. In August of 1999, BAM's subdivision plat was recorded in the Salt lake County Recorder's Office, and BAM later began construction of Westridge Meadows.

## ISSUE AND STANDARD OF REVIEW

¶ 34 BAM raises several issues on appeal, but its first argument is dispositive. BAM argues that requiring it to dedicate property for eventual use in widening a street, and improve adjacent property, all without compensation, as a condition to approval of its subdivision proposal, constitutes an unconstitutional "taking" of its property in violation of both federal and state law. This question of law is reviewed under the "correction-of-error standard[ ]," with no particular deference accorded to the trial court. *State v. Pena*, 869 P.2d 932, 936 (Utah 1994).

## ANALYSIS

### I. Introduction: Takings Jurisprudence

¶ 35 BAM argues that requiring it to dedicate a fifty-three foot strip of property and undertake various improvements to property outside the subdivision as a condition to approval of its subdivision proposal effects a "taking" in violation of state and federal constitutional law. Before proceeding to the merits of this claim, it is necessary to discern the nature of BAM's takings challenge.[8]   In

---

7. The June 1998 approval was contingent upon additional requirements which, aside from the fifty-three-foot dedication, substantially mirror the September 1997 requirements listed above. However, the June 1998 approval eliminated the former requirement regarding "[a] minium 15′ wide landscaping area ... along 3500 South" and added a requirement that the landowner

"[i]nstall an emergency service turnaround as required by the Fire Department."

8. · At oral argument, BAM correctly characterized its claim as one for inverse condemnation, which "is simply a generic description applicable to all actions in which a property owner, in the absence of a formal condemnation [i.e., eminent domain] proceeding, seeks to recover from a

so doing, this opinion first summarizes relevant United States Supreme Court jurisprudence.[9]

¶ 36 The Takings Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, *see Chicago, Burlington & Quincy R.R. Co. v. Chicago,* 166 U.S. 226, 241, 17 S.Ct. 581, 586, 41 L.Ed. 979 (1897), provides that "private property [shall not] be taken for public use, without just compensation."[10] U.S. Const. amend. V. The Court has traditionally recognized two categories of takings: "physical takings" and so-called "regulatory takings." *See, e.g., Yee v. City of Escondido,* 503 U.S. 519, 527, 112 S.Ct. 1522, 1528, 118 L.Ed.2d 153 (1992) (distinguishing the Court's "regulatory takings cases" from its "physical takings" cases); *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 430, 102 S.Ct. 3164, 3173, 73 L.Ed.2d 868 (1982) (distinguishing a "physical occupation" from a "regulation that merely restricts the use of property"); *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124–25, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (implicitly recognizing distinct categories of physical and regulatory takings); Abraham Bell & Gideon Parchomovsky, *Givings,* 111 Yale L.J. 547, 559 (2001) ("[I]t is indisputable that the case law recognizes the existence of two types of takings: physical takings and regulatory takings."). Each of these more familiar types of takings, and a third category known as "development exactions," are addressed below.

### A. Physical Takings

¶ 37 A physical taking requires government activity in the form of an invasion, occupation, or intrusion. *See, e.g., Loretto,* 458 U.S. at 426, 102 S.Ct. at 3171. "[G]overnmental action [that] results in '[a] permanent physical occupation' of the property, by the government itself or by others," *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 831, 107 S.Ct. 3141, 3146 (1987) (second alteration in original) (citation omitted), constitutes a per se taking and "requires compensation under the [Takings] Clause." *Palazzolo v. Rhode Island,* 533 U.S. 606, 617, 121 S.Ct. 2448, 2457, 150 L.Ed.2d 592 (2001). *See also Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992) ("[A]t least with regard to permanent invasions[ ], no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation."). *Cf. Yee,* 503 U.S. at 539, 112 S.Ct. at 1534 ("Because the ... ordinance does not compel a landowner to suffer the

governmental entity for the appropriation of his property interest." 2A Nichols, Eminent Domain § 6.14[1], at 6–227 (3d ed.2002). "[T]he inverse condemnation action is available to any landowner who suffers destruction or impairment of a protected private property right." *Id.* § 6.14[1], at 6–230. Moreover, although BAM correctly points out that inverse condemnation claims brought under Article I, Section 22 of the Utah Constitution are "self-executing," this means only that such claims may be brought even absent authorizing legislation and that such claims are exempt from the limitations found in the Utah Governmental Immunity Act. *See Colman v. Utah State Land Bd.,* 795 P.2d 622, 630–35 (Utah 1990). It does not follow, as BAM contends, that inverse condemnation claims are automatically exempt from requirements such as exhaustion of administrative remedies.

9. The lack of a "coherent test" and resulting "sea of uncertainty" in takings law inspired one pair of commentators to quip that "takings jurisprudence is considered a leading candidate for the 'doctrine-in-most-desperate-need-of-a-principle prize.' " Abraham Bell & Gideon Parchomovsky, *Givings,* 111 Yale L.J. 547, 558–60 (2001) (citation omitted). Another scholar noted that

"[t]he incoherence of the U.S. Supreme Court's output in this field has by now been demonstrated time and again by practitioners and academic commentators ad nauseam, and I refuse to add to the ongoing gratuitous slaughter of trees for the paper consumed in this frustrating and increasingly pointless enterprise." Gideon Kanner, *Hunting the Snark, Not the Quark: Has the U.S. Supreme Court Been Competent in Its Effort to Formulate Coherent Regulatory Takings Law?,* 30 The Urban Lawyer 307, 308 (Spring 1998). Nevertheless, a summary of takings jurisprudence is important in the disposition of BAM's appeal, especially considering the dearth of Utah case law on the subject.

10. Similarly, the Utah Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." Utah Const. art. I, § 22. The Utah provision has been characterized as broader than its federal counterpart because it protects not only property that is "taken," but also property that is "damaged" for public use. *See Bagford v. Ephraim City,* 904 P.2d 1095, 1097 (Utah 1995).

physical occupation of his property, it does not effect a *per se* taking under *Loretto.*") (emphasis in original).

## B. Regulatory Takings

¶ 38 In contrast to a physical taking, a regulatory takings claim challenges state or local laws that impose "regulations" or "restrictions" on the *"use"* of property. *Yee,* 503 U.S. at 532, 539, 112 S.Ct. at 1531, 1534 (emphasis in original). *See Loretto,* 458 U.S. at 430, 102 S.Ct. at 3173 ("[R]ecent cases confirm the distinction between a permanent physical occupation ... and a regulation that merely restricts the use of property."). In the famous words of Justice Holmes, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). However, "[i]n 70–odd years of succeeding regulatory takings jurisprudence, [the Court has] generally eschewed any set formula for determining how far is too far." *Lucas,* 505 U.S. at 1015, 112 S.Ct. at 2893 (quotations and citations omitted). Instead, the Court has "examined the taking question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the governmental action—that have particular significance." *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 349, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986) (quotations and citations omitted).

¶ 39 Despite the ad hoc nature of regulatory takings inquiries, at least one general rule has emerged: "[T]he Fifth Amendment is violated when land-use regulation 'does not substantially advance legitimate state interests or denies an owner economically viable use of his land.'" *Lucas,* 505 U.S. at 1016, 112 S.Ct. at 2894 (emphasis omitted) (quoting *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)).[11] *Cf. Three D Corp. v. Salt Lake City,* 752 P.2d 1321, 1325 (Utah Ct.App.1988) ("Where governmental action, not amounting to a physical taking, effectively deprives a property owner of reasonable access to property, the owner is entitled to compensation[.]") (footnote omitted). This general rule incorporates the underlying principle that while "[o]ur cases have not elaborated on the standards for determining what constitutes a 'legitimate state interest[,]' ... [t]hey have made clear ... that a broad range of governmental purposes and regulations satisfies these requirements." *Nollan,* 483 U.S. at 834–35, 107 S.Ct. at 3147. *See also Loretto,* 458 U.S. at 441, 102 S.Ct. at 3179 ("We do not ... question the ... substantial authority upholding a State's broad power to impose appropriate restrictions upon an owner's *use* of his property.") (emphasis in original).

## C. Development Exactions

¶ 40 Along with the traditional categories of physical and regulatory takings, a third category of takings has emerged in the case law, namely "development exactions."[12]

11. The per se rule of *Lucas* is not absolute, but is limited by "the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1028, 112 S.Ct. 2886, 2900, 120 L.Ed.2d 798 (1992).

12. It is helpful to think of exactions as sort of a hybrid between physical and regulatory takings. The Court acknowledged as much in *Nollan v. California Coastal Commission* when it characterized "a classic right-of-way easement" as a physical taking but nevertheless applied the regulatory takings test. 483 U.S. 825, 831 & n. 1, 107 S.Ct. 3141, 3146 & n. 1, 97 L.Ed.2d 677 (1987) ("We think a 'permanent physical occupation' has occurred ... where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises."). The Court explained: "Given, then, that requiring uncompensated conveyance of the easement outright would violate the Fourteenth Amendment, the question becomes whether requiring it to be conveyed as a condition for issuing a land-use permit alters the outcome." *Id.* at 834, 107 S.Ct. at 3147. The Court then applied the regulatory takings test of whether the regulation " 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land.'" *Id.* (alterations in original) (citations omitted).

Similarly, in *Dolan v. City of Tigard,* the Court distinguished the garden-variety regulatory tak-

" '[D]evelopment exactions may be defined as contributions to a governmental entity imposed as a condition precedent to approving the developer's project. Usually, exactions are imposed prior to the issuance of a building permit or zoning/subdivision approval.' " *Salt Lake County v. Board of Educ.*, 808 P.2d 1056, 1058 (Utah 1991) (citation omitted). Exactions will generally "serve more than a single development," 8A Nichols, Eminent Domain § 17.01, at 17–7 (2002), and " 'may take the form of: (1) mandatory dedications of land for roads, schools or parks, as a condition to plat approval, (2) fees-in-lieu of mandatory dedication, (3) water or sewage connection fees and (4) impact fees.' " *Salt Lake County v. Board of Educ.*, 808 P.2d at 1058 (citation omitted). Exactions "enable local government to acquire land for highway expansion at no charge to the public. The dedicated land is reserved in its present state until the government is ready to widen the adjacent highway or construct a new roadway." 8A Nichols, Eminent Domain § 17.02[3], at 17–17.

¶ 41 In the famous *Nollan* and *Dolan* decisions, *see Dolan v. City of Tigard*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), the Court adopted a two-pronged test

that development exactions—at least when they take the form of forced dedications of property—must satisfy to withstand scrutiny under the Takings Clause.[13] In *Nollan*, the Court revisited the "long[-]recognized" rule that a "land-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land.' " *Id.* at 834, 107 S.Ct. at 3147 (second and third alterations in original) (citation omitted). The Court acknowledged that it had "not elaborated on the standards for determining what constitutes a 'legitimate state interest' or what type of connection between the regulation and the state interest satisfies the requirement that the former 'substantially advance' the latter." *Id.* In addressing these questions, the Court set forth the first prong of the *Nollan/Dolan* test: there must be an " 'essential nexus' ... between the 'legitimate state interest' and the permit condition exacted by the [governmental entity]." *Dolan*, 512 U.S. at 386, 114 S.Ct. at 2317 (quoting *Nollan*, 483 U.S. at 837, 107 S.Ct. at 3148).

¶ 42 In *Dolan*, the Court resolved the question it left unanswered in *Nollan:* If an "essential nexus" exists, what is the required degree of connection between the exactions

ings cases from the case before it, which involved a redevelopment permit conditioned upon a forced dedication of land. *See* 512 U.S. 374, 385, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994). The Court stated:

> First, [those cases] involved essentially legislative determinations classifying entire areas of the city, whereas here the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel. Second, the conditions imposed were not simply a limitation on the *use* petitioner might make of her own parcel, but a requirement that she deed portions of the property to the city.

*Id.* (emphasis added). Thus, it is clear that exactions do not fit neatly into either the regulatory or physical takings jurisprudence. *See Rogers Mach., Inc. v. Washington County*, 181 Or.App. 369, 45 P.3d 966, 973 (characterizing exactions as an "amalgamation" between physical and regulatory takings and noting that "[e]xactions do not fit neatly within the more conventional Takings Clause analytical construct"), *review denied*, 334 Or. 492, 52 P.3d 1057 (Or.2002), *cert. denied*, 538 U.S. 906, 123 S.Ct. 1482, 155 L.Ed.2d 225 (2003); *Town of Flower Mound v. Stafford Es-*

*tates*, 71 S.W.3d 18, 30 (Tex.App.) ("In an exaction takings case, the landowner is not simply denied or restricted in some desired use of his property. Rather, in an exaction takings case, some action—the exaction—is required of the landowner as a condition to obtaining governmental approval."), *review granted*, 2002 Tex. LEXIS 209 (Tex.2002); *Sparks v. Douglas County*, 127 Wash.2d 901, 904 P.2d 738, 742 (1995) (recognizing that "[the physical takings] rule does not necessarily apply ... where conveyance of a property right is required as a condition for issuance of a land permit"); 8 Nichols, Eminent Domain § 14E.04[4], at 14E–33 & 14E–34 (2002) ("[T]he *Dolan* rule applies only to case-by-case land exactions, and not to community wide zoning and land use regulations."); *Taking "Takings Rights" Seriously: A Debate on Property Rights Legislation Before the 104th Congress*, 9 Am. U. Admin. L.J. 253, 277 (1995) (designating *Dolan* as an example of a "special category of cases ... called dedication and exaction cases").

**13.** As explained more fully below, it is unclear whether the Court's analysis applies to development exactions other than forced dedications of property.

and the projected impact of the proposed development?[14] In response, the Court set forth the "rough proportionality" prong of the test, which requires the governmental entity to "make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Dolan,* 512 U.S. at 391, 114 S.Ct. at 2319–20.

¶ 43 To summarize the *Nollan/Dolan* two-prong test, a development exaction in the form of a forced dedication of real property will constitute a taking, necessitating just compensation, unless the government demonstrates that (1) an " 'essential nexus' exists between the 'legitimate state interest' and the permit condition exacted by the [governmental entity]," and (2) "the required dedication is related both in nature and extent to the impact of the proposed development." *Dolan,* 512 U.S. at 386, 391, 114 S.Ct. at 2317, 2319–20.

¶ 44 After considering the rules and rationales underlying physical, regulatory, and ex-actions takings cases, it appears that BAM's claim most closely fits within the framework of the development exactions cases. The County conditioned approval of BAM's proposed subdivision on dedication of property to be used in the future for widening 3500 South—at least if the County's Master Transportation Plan were to be eventually implemented. The forced dedication is a " 'contribution[ ] to a governmental entity imposed as a condition precedent to approving the developer's project,' " which is within the definition of an exaction as set forth in *Salt Lake County v. Board of Education,* 808

P.2d at 1058 (citation omitted). More importantly, the facts of this case mirror the facts of both *Nollan,* where the landowner was forced to grant an easement to the public in exchange for a building permit, and *Dolan,* where the landowner was forced to dedicate a portion of her property to the city of Tigard in exchange for a development permit. *See Dolan,* 512 U.S. at 385–86, 114 S.Ct. at 2317.

¶ 45 Having concluded that BAM has stated a claim for an exaction in the form of a forced dedication of real property, it is necessary to determine what, if any, procedural requirements BAM must comply with and whether it has done so in this case.

## II. Preservation of Issues

¶ 46 The County argues, and the trial court agreed, that "the only issue appealed by BAM to the County Commission, and thus preserved by exhaustion of administrative remedies, was the County's requirement of a 53–foot highway dedication, rather than a 40–foot dedication." Thus, the County maintains that "the only issue properly before this Court" is whether the thirteen-foot increase in the County's dedication requirement effected a taking of BAM's property. BAM, on the other hand, urges us to address the constitutionality of the entire fifty-three-foot dedication as well as the County's additional in-kind improvement requirements.

¶ 47 Although the County phrases its argument in jurisdictional terms, the County's objection, in reality, is one of issue-preservation rather than exhaustion of administrative remedies.[15] Tellingly, the County concedes

---

14. The Court did not address this question in *Nollan* because, while it "agreed that the Coastal Commission's concern with protecting visual access to the ocean constituted a legitimate public interest," the Court determined there was no "essential nexus" between "visual access to the ocean and a permit condition requiring lateral public access along the Nollans' beachfront lot." *Dolan,* 512 U.S. at 386–87, 114 S.Ct. at 2317. Because the "essential nexus" prong was not satisfied, the Court had no occasion to decide "the required degree of connection between the exactions and the projected impact of the proposed development." *Id.* at 386, 114 S.Ct. at 2317.

15. In any event, it is far from clear that exhaustion requirements would apply to BAM, at least

insofar as its challenge to the County's forced dedication of real property is concerned. It is true that in reference to a garden-variety land-use regulation, "an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property. A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986). Such logic does not apply to a development exaction consisting of a forced dedication of real property. The County did not attempt to regulate the "use" of BAM's land, but conditioned its approval of BAM's sub-division proposal on a forced dedication of real

that "BAM followed the appeal procedure outlined in the Utah statute and corresponding Salt Lake County Ordinance provision[s]." Thus, the County's real quarrel is with the wording of BAM's appeal to the Board of County Commissioners, which challenges the County's decision to deny development approval with the 40–foot dedication and argues that the County's imposition of "increased expenses and uncompensated dedication of private property for public use, is arbitrary, capricious, . . . and contrary to law."

¶ 48 It is true that "a party seeking review of agency action must raise an issue before that agency to preserve the issue for further review." *Badger v. Brooklyn Canal Co.*, 966 P.2d 844, 847 (Utah 1998). Pursuant to the "level of consciousness" test, "a plaintiff [must] bring an issue to the fact finder's attention so that there is at least the possibility that it could be considered."[16] *Id.*

¶ 49 It must be concluded that BAM's appeal properly encompassed its objection to the entire dedication of real property such that the Board of County Commissioners was, or should have been, conscious of it. BAM's argument that the County should have approved its proposal with the 40–foot dedication does not foreclose its further argument that the County's requirement of "uncompensated dedication of private property," in whatever amount, is "unconstitutional."

¶ 50 Furthermore, this case is in a somewhat unusual posture because the "level of consciousness" test is being applied not to a hearing or other administrative proceeding, but to BAM's written notice of appeal. *Cf. Badger*, 966 P.2d at 847 (applying level of consciousness test to informal hearing before State Engineer); *US Xpress, Inc. v. Utah*

*State Tax Comm'n*, 886 P.2d 1115, 1119 n. 7 (Utah Ct.App.1994) (applying level of consciousness test to hearing before State Tax Commission); *Ashcroft v. Industrial Comm'n*, 855 P.2d 267, 268–69 (Utah Ct. App.) (holding that plaintiff waived issues not presented to the administrative law judge during formal hearing), *cert. denied*, 868 P.2d 95 (Utah 1993). In light of the fact that the County Commission summarily denied BAM's appeal without a hearing, foreclosing the opportunity for BAM to develop and explain its concerns, an unnecessarily crabbed reading of BAM's notice of appeal is not required by the "level of consciousness" test, and that test does not foreclose consideration of the constitutionality of requiring the entire fifty-three-foot dedication.

¶ 51 A different conclusion is reached, however, on the question of whether BAM properly preserved its objection to the County's requirement that certain in-kind improvements be made. On appeal, BAM challenges, to an unclear extent, a number of improvements required by the County as a condition to subdivision approval, including installation of curbs, gutters, stormdrain lines, sidewalks, and fencing. BAM argues that such improvements are "unconstitutionally excessive and/or unreasonable." The only possible evidence of preservation of this argument in BAM's written appeal to the Board of County Commissioners is in BAM's objection to the County's "increased expenses." Even under the most liberal construction of BAM's notice of appeal, it cannot be said that this issue was sufficiently raised such that the Board of County Commissioners should have been conscious of it.

¶ 52 Furthermore, even if BAM had properly preserved this argument, BAM advances no convincing argument that the County's improvement requirements should be invali-

---

property. The only question is whether the County's exaction of BAM's property constituted a taking. *See Nelson v. City of Lake Oswego*, 126 Or.App. 416, 869 P.2d 350, 353 (1994) (en banc) ("[No] case of which we are aware attaches an exhaustion or ripeness prerequisite to the litigation of claims, like those here, that are based on a development condition that has resulted in the actual acquisition of a private property interest by the government.").

16. The "level of consciousness" test is a "less exacting standard" than that applied in a trial setting, where preservation requires that "(1) 'the issue ... be raised in a timely fashion;' (2) 'the issue ... be specifically raised;' and (3)[the] party must introduce 'supporting evidence or relevant legal authority.'" *Badger v. Brooklyn Canal Co.*, 966 P.2d 844, 847 (Utah 1998) (quoting *Hart v. Salt Lake County Comm'n*, 945 P.2d 125, 130 (Utah Ct.App.), *cert. denied*, 953 P.2d 449 (Utah 1997)).

dated, or for that matter even analyzed, under *Nollan* and *Dolan*.[17] The County cannot force BAM to dedicate and improve 3500 South based solely on its own transportation planning goals, rather than on the impacts of BAM's subdivision, because this would force BAM "alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Nevertheless, there is "an important distinction between ordinances requiring installation of streets, sidewalks, sewers and drainage facilities which are inextricably tied to the needs of the subdivision development, and those ordinances which require dedication of land . . . where the nexus between the use requirement and the subdivision development is less than evident." 2A Nichols, Eminent Domain § 6.13[3][b], at 6 218 (3d ed.2002). *See also Art Piculell Group v. Clackamas County*, 142 Or.App. 327, 922 P.2d 1227, 1234 (1996) ("[C]onditions that in whole or in part serve the needs of the development itself should be weighed differently than pure 'exactions' of the kind that serve only to mitigate an impact of the development on the public or public facilities.").

¶ 53 For example, the County's requirement that BAM install a fence and a sidewalk along the portion of its property abutting 3500 South seems to be "inextricably tied to the needs of [BAM's] subdivision," 2A Nichols, Eminent Domain § 6.13[3][b], at 6–218, because such improvements undoubtedly inure to the convenience and safety of the subdivision residents. In any event, absent proper preservation at the County Commission level and a well-developed argument on appeal, BAM's objection to the County's in-kind improvement requirements need be addressed no further.

## III. Merits of BAM's Takings Challenge

¶ 54 Having resolved the threshold issue of preservation, this opinion proceeds to the merits of BAM's takings challenge. Although BAM has formulated its takings challenge to include separate claims for relief under both state and federal law, the legal principles underlying both claims are largely the same and this opinion therefore treats them concurrently. *See, e.g., San Remo Hotel v. City & County of San Francisco*, 27 Cal.4th 643, 117 Cal.Rptr.2d 269, 41 P.3d 87, 100–101 (2002) (construing federal and state takings clauses congruently); *Sparks v. Douglas County*, 127 Wash.2d 901, 904 P.2d 738, 741 (1995) (same).

¶ 55 As outlined above, it must now be determined whether the two-pronged *Nollan/Dolan* test is satisfied here. The County, however, argues that the *Nollan/Dolan*

---

**17.** This is not to say that improvement exactions may never be subject to *Nollan/Dolan* scrutiny. *See McClure v. City of Springfield*, 175 Or.App. 425, 28 P.3d 1222, 1227–28 (2001) (applying *Dolan* to city ordinance requiring dedication of property and installation of sidewalks, driveway improvements, and street lighting), *review denied*, 334 Or. 327, 52 P.3d 435 (2002); *Art Piculell Group v. Clackamas County*, 142 Or.App. 327, 922 P.2d 1227, 1230–31 (1996) (applying *Dolan* to county requirement that landowner dedicate and approve public street abutting his subdivision); *Clark v. City of Albany*, 137 Or.App. 293, 904 P.2d 185, 189 (1995) (applying *Dolan* to improvement exactions because the court saw "little difference between a requirement that a developer convey title to the part of the property that is to serve a public purpose, and a requirement that the developer himself make improvements on the affected and nearby property and make it available for the same purpose"), *review denied*, 322 Or. 644, 912 P.2d 375 (1996); *Town of Flower Mound v. Stafford Estates*, 71 S.W.3d 18, 33 (Tex.Ct.App.) (applying *Dolan* to town ordinance requiring road improvements because improvement exactions "involve conditional governmental land use approval and present the same opportunities for governmental 'leveraging' [as dedicatory exactions]"), *review granted*, 2002 Tex. LEXIS 209 (Tex.2002); *Benchmark Land v. City of Battle Ground*, 94 Wash.App. 537, 972 P.2d 944, 950 (1999) (holding that "*Nollan* and *Dolan* apply here where the City requires the developer as a condition of approval to incur substantial costs improving an adjoining street"), *aff'd on other grounds*, 146 Wash.2d 685, 49 P.3d 860 (2002); *Burton v. Clark County*, 91 Wash. App. 505, 958 P.2d 343, 348, 357 (1998) (applying *Nollan/Dolan* to county requirement that permit applicants make "road dedications and improvements"), *review denied*, 137 Wash.2d 1015, 978 P.2d 1097 (1999). *But see Parking Ass'n of Georgia, Inc. v. City of Atlanta*, 264 Ga. 764, 450 S.E.2d 200, 201–02, 204 (1994) (refusing to apply *Dolan* to city parking lot ordinance requiring owners to install barrier curbs and landscaping improvements even though three dissenting justices argued that *Nollan* and *Dolan* were controlling), *cert. denied*, 515 U.S. 1116, 115 S.Ct. 2268, 132 L.Ed.2d 273 (1995).

exactions analysis does not apply to this case. Specifically, the County argues, and the trial court agreed, that the *Nollan/Dolan* analysis applies only to "ad hoc discretionary assessment[s] imposed on an individualized basis" and not to "a generally-applicable legislative scheme, uniformly imposing a regulatory standard for road-width dedication by subdivision developments." [18]

¶ 56 In the instant case, it should not matter whether the County ordinance at issue here is indeed a "generally applicable" "uniformly imposed" legislative scheme because *Nollan/Dolan* heightened scrutiny [19] should apply to *any* forced dedication of real property, regardless of whether the exactions are imposed on an individualized basis or via a comprehensive legislative scheme.[20] This

**18.** It should be noted that unrebutted evidence introduced at trial casts substantial doubt on this characterization in any event. For example, testimony from William A. Marsh, a land-use planner employed by Salt Lake County for over twenty-eight years, elicited the following information:

Q. Okay. How does the county determine how much that developer then dedicates; in other words, what the half width actually is?

A. When the subdivision application is processed, the recommendation is sent out. In the case of 3500 South, where it's a state highway, it goes to the county transportation engineer and to UDOT.

Q. Okay. And who makes that determination as to what the half width is?

A. It would be based on the recommendations that come back from those agencies.

Q. Okay. So at any given moment we can't, say, look in the book and see what that half width determination is?

A. We have the map that guides us, but until we get the final written recommendation we don't know for sure.

Such testimony belies the County's assurances that there is no discretion involved in assessing its road-width dedication requirements.

**19.** There has been some confusion about whether *Nollan* and *Dolan* imposed a new form of heightened scrutiny. In *Nollan*, the Court stated that "our verbal formulations in the takings field have generally been quite different" from "those applied to due process or equal protection claims" because "[w]e have required that the regulation 'substantially advance' the 'legitimate state interest' sought to be achieved, not that 'the State "could rationally have decided" that the measure adopted might achieve the State's objective.'" 483 U.S. at 834 n. 3, 107 S.Ct. at 3147 n. 3 (emphasis in original) (citations omitted). Therefore, *Nollan* and *Dolan* could be interpreted as merely clarifying the heightened scrutiny that already applied to regulatory takings claims. *See, e.g., Smith Inv. Co. v. Sandy City*, 958 P.2d 245, 258 n. 18 (Utah Ct.App.1998) ("[T]he takings analysis ... adds the word 'substantially' before 'advance.' Thus, this standard appears to be more stringent than the standard against which we measured the substantive due process validity of the ordinance."). However, the Court's subsequent warning about being "particularly careful about the adjective" of "substantial" when an "actual conveyance of property" is

at issue, *Nollan*, 483 U.S. at 841, 107 S.Ct. at 3150–51, implies that such claims are subject to increased scrutiny beyond that applied to garden-variety land-use regulations. As discussed in Note 20, courts and commentators have disagreed about what *type* of cases invoke *Nollan/Dolan* scrutiny. Most, however, agree that *Nollan* and *Dolan* do impose some sort of heightened scrutiny. *See, e.g., San Remo Hotel v. City & County of San Francisco*, 27 Cal.4th 643, 117 Cal.Rptr.2d 269, 41 P.3d 87, 102 (2002) ("'Thus in *Nollan*, the rule that [physical occupations are per se takings] is transformed, in the context of a development application, into a rule of heightened scrutiny to ensure that a required development dedication is not a mere pretext to obtain or otherwise physically invade property without just compensation.'") (citation omitted). *See also* Lee Anne Fennell, *Hard Bargains & Real Steals: Land Use Exactions Revisited*, 86 Iowa L.Rev. 1, 4, 9–12 (2000) (arguing that "wholesale application of *Dolan* to regulatory takings jurisprudence would abruptly dismantle nearly seventy-five years of zoning law").

**20.** It must be acknowledged that the scope of the *Nollan/Dolan* analysis is unsettled. In other words, because both *Nollan* and *Dolan* were decided in the context of forced dedications of real property administered, according to the Court, on an individualized, adjudicative basis, it is unclear whether one or both of those conditions must exist for *Nollan/Dolan* heightened scrutiny to apply. *See, e.g.,* Fennell, *Hard Bargains*, 86 Iowa L.Rev. at 10–11 (stating that two uncertainties exist after *Nollan* and *Dolan*: (1) "whether *Dolan's* requirement of rough proportionality applies when land use 'conditions' are not selectively imposed on individual landowners, but are instead embedded in legislative enactments" and (2) whether *Nollan* and *Dolan*, which "both involved actual concessions of land" apply to "other kinds of concessions (such as cash payments or the provision of unrelated amenities)"). *See also Rogers Mach. Inc. v. Washington County*, 181 Or.App. 369, 45 P.3d 966, 976 (2002) ("In the eight years since *Dolan* was decided, no consensus has emerged among lower courts on [the above] questions and, so far, the Supreme Court has declined to grant certiorari in cases that might have provided further guidance."), *review denied*, 334 Or. 492, 52 P.3d 1057 (2002), *cert. denied*, 538 U.S. 906, 123 S.Ct. 1482, 155 L.Ed.2d 225 (2003). *See also, e.g., San*

is so for at least two reasons. First, "[i]t is not clear why the existence of a taking should turn on the type of governmental entity responsible for the taking." *Parking Ass'n of Georgia, Inc. v. City of Atlanta,* 515 U.S. 1116, 115 S.Ct. 2268, 2268–69, 132 L.Ed.2d 273 (1995) (Thomas, J., joined by O'Connor, J., dissenting from denial of certiorari). For example, "[a] city council can take property just as well as a planing commission can."[21] *Id.* at 1118, 115 S.Ct. at 2269. *See also Amoco Oil Co. v. Village of Schaumburg,* 277 Ill.App.3d 926, 214 Ill.Dec. 526, 661 N.E.2d 380, 390 (1995) ("[A] municipality should not be able to insulate itself from a takings challenge merely by utilizing a different bureaucratic vehicle when expropriating its citizen's property."), *cert. denied,* 519 U.S. 976, 117 S.Ct. 413, 136 L.Ed.2d 325 (1996); *McClure v. City of Springfield,* 175 Or.App. 425, 28 P.3d 1222, 1224 (2001) (noting parties' stipulation that "the city's enactment of dedication requirements as an ordinance did not relieve it of the obligation to make particularized findings showing that any resulting exactions were roughly proportional to the impact of the proposed development"), *review denied,* 334 Or. 327, 52 P.3d 435 (2002).

¶ 57 Second, it is not always easy to tell the difference between an individualized, adjudicative decision and a "uniformly imposed" legislative scheme. This ambiguity is manifest in *Dolan* itself, where the majority characterized the city's action as an "adjudicative decision" without further explanation, while Justice Souter, in dissent, pointed out that "the permit conditions were imposed pursuant to [the city's] Community Development Code."[22] *Dolan v. City of Tigard,* 512 U.S. 374, 413, n. *, 114 S.Ct. 2309, 2331, n. * (1994) (Souter, J., dissenting). Distinguishing between adjudicative and legislative action is made even more difficult because "local governments are not structured under strict separation of powers principles" and "the nature of the land use decision-making process relies on flexibility and discretion." Inna Reznik, *The Distinction Between Legislative & Adjudicative Decisions in Dolan v. City of Tigard,* 75 N.Y.U. L.Rev. 242, 257 (2000).[23] Notwithstanding these uncertainties, it must be concluded that all forced dedications of property are subject to *Nollan/Dolan* scrutiny. This conclusion is premised on the United States Supreme Court's well-settled takings jurisprudence

---

*Remo Hotel,* 117 Cal.Rptr.2d 269, 41 P.3d at 102–05 (discussing scope of *Nollan/Dolan* analysis); *Krupp v. Breckenridge Sanitation Dist.,* 19 P.3d 687, 695–98 (Colo.2001) (en banc) (same); *Town of Flower Mound,* 71 S.W.3d at 31–35 (same); Inna Reznik, *The Distinction Between Legislative & Adjudicative Decisions in Dolan v. City of Tigard,* 75 N.Y.U. L.Rev. 242, 252 (2000) (cataloguing the pervasive confusion among lower courts attempting to interpret and apply *Dolan* ).

21. Noting the conflict among lower courts over "whether *Dolan's* test for property regulation should be applied in cases where the alleged taking occurs through an Act of the legislature," Justice Thomas concluded:

It is hardly surprising that some courts have applied *Dolan's* rough proportionality test even when considering a legislative enactment.... [T]he general applicability of the ordinance should not be relevant in a takings analysis. If Atlanta had seized several hundred homes in order to build a freeway, there would be no doubt that Atlanta had taken property. The distinction between sweeping legislative takings and particularized administrative takings appears to be a distinction without a constitutional difference.

*Parking Ass'n of Georgia, Inc., v. City of Atlanta,* 515 U.S. 1116, 115 S.Ct. 2268, 2268–69, 132 L.Ed.2d 273 (1995) (Thomas, J., joined by O'Connor, J., dissenting from denial of certiorari).

22. Specifically, the City of Tigard imposed the floodplain exaction pursuant to its Master Drainage Plan, codified in its Community Development Code and required by the State of Oregon, which required land dedications from all permit applicants seeking to develop land "within and adjacent to the 100 year floodplain." *Dolan,* 512 U.S. at 377–79, 114 S.Ct. at 2313–14. Of course, these facts are strikingly similar to the ones before us, where the County, acting pursuant to its Transportation Master Plan, required dedications from all landowners seeking to develop property abutting 3500 South Street. It seems, therefore, that the County cannot fairly characterize the scheme in *Dolan* as "ad hoc" and "discretionary" without so characterizing its own.

23. Ms. Reznik astutely points out that some exactions "are somewhere in the middle of adjudicative and legislative" because "the legislature [may give] some guidelines, [while] the administrative body retain[s] considerable discretion as well." Reznik, *The Distinction Between Legislative & Adjudicative Decisions in Dolan v. City of Tigard,* 75 N.Y.U. L.Rev. at 266.

holding that physical invasions, occupations, or mandated conveyances of real property are entitled to special treatment. As the Court stated in *Nollan v. California Coastal Commission,*

> our cases describe the condition for abridgement of property rights through the police power as a *'substantial* advanc[ing]' of a legitimate state interest. We are inclined to be particularly careful about the adjective where the *actual conveyance* of property is made a condition to the lifting of a land-use restriction, since in that context there is heightened risk that the purpose is avoidance of the compensation requirement, rather than the stated police-power objective.

483 U.S. 825, 841, 107 S.Ct. 3141, 3150–51, 97 L.Ed.2d 677 (1987) (alteration and first emphasis in original). The Court has "repeatedly held that, as to property reserved by its owner for private use, 'the right to exclude [others is] "one of the most essential sticks in the bundle of rights that are commonly characterized as property." ' " *Id.* at 831, 107 S.Ct. at 3145 (alteration in original) (citations omitted). Anything less than *Nollan/Dolan* scrutiny, at least when an actual conveyance of property is at issue, falls short of adequately protecting these rights. Accordingly, this opinion now addresses the question of whether the County's uncompensated dedication requirement passes muster under *Nollan.*

### A. *Nollan* and the "Essential Nexus"

¶ 58 Under *Nollan,* "[a court] must first determine whether the 'essential nexus' exists between the 'legitimate state interest' and the permit condition exacted by the [governmental entity]." *Dolan,* 512 U.S. at 386, 114 S.Ct. at 2317 (quoting *Nollan,* 483 U.S. at 836–37, 107 S.Ct. at 3148). In doing so here, it is appropriate to review the facts of *Nollan.*

¶ 59 The Nollans planned to replace their beachfront bungalow with a three-bedroom house. When they applied to the California Coastal Commission for a development permit, the Nollans were told the permit would be denied unless they agreed to a public easement across their beachfront lot. The Commission argued that the easement was necessary to advance legitimate state interests such as "protecting the public's ability to see the beach, assisting the public in overcoming the 'psychological barrier' to using the beach created by a developed shorefront, and preventing congestion on the public beaches." *Id.* at 835, 107 S.Ct. at 3148. The Court assumed, without deciding, that the above interests were legitimate and agreed with the Commission that "a permit condition that serves the same legitimate police-power purpose as a refusal to issue the permit should not be found to be a taking if the refusal to issue the permit would not constitute a taking." *Id.* at 836, 107 S.Ct. at 3148. Thus, if the "Commission could have exercised its police power ... to forbid construction of the house altogether," it may, in the alternative, impose permit conditions—for example, height or width restrictions—that would further the legitimate state interest of protecting "the public's ability to see the beach." *Id.*

¶ 60 However, the Court went on to explain that "[t]he evident constitutional propriety disappears ... if the condition substituted for the prohibition utterly fails to further the end advanced as the justification for the prohibition." *Id.* at 837, 107 S.Ct. at 3148. Such was the case in *Nollan.* The Court found it

> quite impossible to understand how a requirement that people already on the public beaches be able to walk across the Nollans' property reduces any obstacles to viewing the beach created by the new house[,] how it lowers any "psychological barrier" to using the public beaches, or how it helps to remedy any additional congestion on them caused by construction of the Nollans' new house.

*Id.* at 838–39, 107 S.Ct. at 3149. Thus, "the lack of nexus between the condition and the original purpose of the building restriction converts that purpose to something other than what it was. The purpose then becomes, quite simply, the obtaining of an easement to serve some valid governmental purpose, but without payment of compensation." *Id.* at 837, 107 S.Ct. at 3149. Such a restriction "is not a valid regulation of land use but

'an out-and-out plan of extortion.'" *Id.* (citation omitted).

¶ 61 Having reviewed the holding and rationale underlying *Nollan,* this opinion now turns to the facts of the instant case. The County devotes the majority of its takings analysis to arguing that *Nollan* and *Dolan* are inapplicable to this case. In so doing, the County fails to articulate, in the alternative, the legitimate state interests in support of its dedication requirements, arguing only in passing that "[s]uch a uniform scheme is fundamental to ensuring that community development occurs in accordance with sensible long-range transportation planning." [24] Following the lead of the *Nollan* Court, it may be assumed that the County's traffic goals are a legitimate governmental interest.[25] *See Smith Inv. Co. v. Sandy City,* 958 P.2d 245, 255 (Utah Ct.App.1998) (" '[I]t is clear that the flow of traffic is a legitimate concern of a municipal legislative body in its enactment of zoning regulations.' ") (quoting Kenneth H. Young, Anderson's American Law of Zoning § 3A.04 (4th ed.1996)). Nevertheless, the validity of the interest does not, by itself, justify imposing the entire cost of realizing that goal upon BAM and other landowners whose property abuts 3500 South. *See* 8A Nichols, Eminent Domain § 17.01, at 17–6, 17–7 (2002) (articulating the reasons "it makes a great deal of sense for a governmental agency to attempt to acquire, or at least reserve, land for major roads before an area develops" but nevertheless noting that "the need for reducing the cost of acquiring public right-of-way ... cannot override the constitutional guarantee that an individual's property rights be protected"). Rather, the County must demonstrate an "essential nexus" between that interest and the roadway dedication requirements it imposed upon BAM. Although the County fails to undertake this demonstration in its brief, the record reveals unrebutted evidence, introduced at trial, that construction of the Westridge Meadows subdivision, consisting of forty-four single-family units, would increase traffic flow along 3500 South only "by approximately three to four percent." [26]

¶ 62 Clearly, there is an "essential nexus" between the problem of increased traffic

24. The Commission advanced a similar argument in *Nollan,* pointing out that it had already similarly conditioned 43 out of 60 coastal development permits along the same tract of land, and that of the 17 not so conditioned, 14 had been approved when the Commission did not have administrative regulations in place allowing imposition of the condition, and the remaining 3 had not involved shorefront property.

483 U.S. at 829, 107 S.Ct. at 3144. The Commission argued that such a scheme was necessary as "part of a comprehensive program to provide continuous public access along [the beach] as the lots undergo development or redevelopment." *Id.* at 841, 107 S.Ct. at 3151. The Court was unmoved, holding that such a justification was "unrelated to land-use regulation" and was "simply an expression of the Commission's belief that the public interest will be served by a continuous strip of publicly accessible beach along the coast." *Id.* The Court continued:

The Commission may well be right that it is a good idea, but that does not establish that the Nollans (and other coastal residents) alone can be compelled to contribute to its realization. Rather, California is free to advance its "comprehensive program," if it wishes, by using its power of eminent domain for this "public purpose...."

*Id.* at 841–42, 107 S.Ct. at 3151.

25. To this end, the County argues that "under BAM's view of constitutional law, road-width requirements for new construction along major traffic corridors would vary radically from parcel-to-parcel, depending on the size, usage, and other impact characteristics of each individual parcel." This would only be true if BAM was challenging the County's authority to require road-width dedications as a condition of development. BAM's argument, however, is that while the County surely has the authority to require such dedications, it does not have the authority to require them for free. Contrary to the County's contention, BAM's view would have no effect on the uniformity of road width along 3500 South—it would just mean that the cost of such uniformity would be borne by the public, not by BAM alone.

26. This conclusion is based on a study promulgated by the Institute of Transportation Engineers, which estimates that the typical residential dwelling generates an average of ten car trips per day. Thus, Westridge Meadows, consisting of forty-four units, would generate approximately 440 additional trips per day on 3500 South, the nearest major street to which Westridge Meadows residents would have vehicular access. Evidence at trial showed that, in 1997, about 13,000 cars traveled on 3500 South per day. Therefore, the 440 additional trips generated by the Westridge Meadows subdivision would increase the 1997 estimate by, at most, three or four percent.

along 3500 South, insofar as attributable to the subdivision, and the solution of property dedication so that 3500 South can eventually be widened. The County, understandably, must project and prepare for the inevitable increase in traffic along state highways. Should widening of 3500 South become necessary in the future, the County ideally would be able to accomplish this without having to buy, only to then demolish and remove, existing structures. BAM's subdivision, as acknowledged by both sides at trial, will necessarily contribute, albeit a relatively small amount, to increased traffic along 3500 South and the eventual need for a wider road. Thus, the County's roadway dedication requirements are connected to the goal of insuring that the County will be able to fulfill that need. Having determined that an essential nexus exists between a legitimate state interest and the required condition of approval, this opinion now addresses whether the required dedication is sufficiently related in both nature and extent to the impact of the proposed development.

## B. *Dolan* and Rough Proportionality

¶ 63 *Dolan* requires this court to determine whether the exactions demanded by the County bear a "rough proportionality" to the "projected impact of [BAM's] proposed development." 512 U.S. at 388–91, 114 S.Ct. at 2318–19. In *Dolan*, the landowner applied for a building permit to expand her plumbing and electrical supply store. *See id.* at 379,

114 S.Ct. at 2313. The city responded that, in exchange for the permit, the landowner would be required to dedicate "the portion of her property lying within the 100–year floodplain for improvement of a storm drainage system ... and that she dedicate an additional 15–foot strip of land adjacent to the floodplain as a pedestrian/bicycle pathway." *Id.* at 379–80, 114 S.Ct. at 2314. As justification for these exactions, the city argued, first, that the floodplain dedication was necessary to alleviate the "anticipated increased storm water flow from the subject property to an already strained creek and drainage basin." *Id.* at 382, 114 S.Ct. at 2315. Second, the city argued that "creation of a convenient, safe pedestrian/bicycle pathway system as an alternative means of transportation 'could offset some of the traffic demand on [nearby] streets and lessen the increase in traffic congestion'" caused, at least in part, by the proposed development. *Id.* at 381–82, 114 S.Ct. at 2314.

¶ 64 After determining that the above justifications satisfied the "essential nexus" prong of *Nollan*, the Court was left with the question of "whether these findings are constitutionally sufficient to justify the conditions imposed by the city on petitioner's building permit." *Id.* at 389, 114 S.Ct. at 2318. After reviewing "representative decisions" by State courts addressing this question, the Court adopted the "rough proportionality" test.[27] *Id.* at 389–91, 114 S.Ct. at

---

**27.** As support for the adoption of this test, the United States Supreme Court cited *Call v. City of West Jordan*, 606 P.2d 217 (Utah 1979) (*Call I* ), modified on reh'g, 614 P.2d 1257 (Utah 1980) (*Call II* ), the only Utah case of which I am aware that addressed the constitutionality of exactions in the form of forced dedications of property. In *Call I*, our Supreme Court addressed the validity of a city ordinance that required subdividers to dedicate seven percent of their land, or pay the cash equivalent, as a condition to development approval. The Court originally upheld the ordinance against a takings challenge because the dedication, which was to be used for " 'flood control and/or parks and recreation facilities,' " bore a "reasonable relationship to the needs created by the subdivision." *Id.* at 220. This was so, the Court held, even though the dedication requirements would necessarily benefit the whole community along with the individual subdivision. *See id.*

After granting the landowner's petition for rehearing, however, the Utah Supreme Court held that "disposition of this issue as a matter of law [is] inappropriate," *Call II*, 614 P.2d at 1258, "without plaintiffs being given the opportunity to present evidence to show that the dedication required of them had no reasonable relationship to the needs for flood control or parks and recreation facilities created by their subdivision, if any." *Id.* at 1259. Like the United States Supreme Court, I think the "reasonable relationship" test is virtually equivalent to the "rough proportionality" test, and thus presents no issue of inconsistency between the precedents of the United States and Utah Supreme Courts. *See Dolan*, 512 U.S. at 391, 114 S.Ct. at 2319 ("[T]he 'reasonable relationship' test adopted by a majority of the state courts is closer to the federal constitutional norm[,] ... [b]ut we do not adopt it as such partly because the term ... seems confusingly similar to the term 'rational basis' which describes the minimal level of scrutiny

2318–19. In other words, "[n]o precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.* at 391, 114 S.Ct. at 2319–20. Under this test, the Court determined that the city had failed to demonstrate that its permit conditions bore a "rough proportionality" to the "projected impact of [the landowner's] proposed development." *Id.* at 388–95, 114 S.Ct. at 2318–22.

¶ 65 Regarding the floodplain dedication, the Court acknowledged that "[i]t is axiomatic that increasing the amount of impervious surface will increase the quantity and rate of storm water flow from petitioner's property." *Id.* at 392, 114 S.Ct. at 2320. "Therefore, keeping the floodplain open and free from development would likely confine the pressures ... created by petitioner's development." *Id.* at 393, 114 S.Ct. at 2320. The city, however, "demanded more—it not only wanted petitioner not to build in the floodplain, but it also wanted petitioner's property ... for its greenway system." *Id.* The city failed to explain "why a public greenway, as opposed to a private one, was required in the interest of flood control." *Id.*

¶ 66 Further, "[w]ith respect to the pedestrian/bicycle pathway," the Court accepted the city's finding that "the larger retail sales facility proposed by petitioner [would] increase traffic" in the downtown area by an estimated "435 additional trips per day." *Id.* at 395, 114 S.Ct. at 2321. The Court also acknowledged that "[d]edications for streets, sidewalks, and other public ways are generally reasonable exactions to avoid excessive congestion from a proposed property use." *Id.*

¶ 67 Nevertheless, the Court held that the city's conclusory statement that "the creation of the pathway 'could offset some of the traffic demand' " fell far short of "demonstrating that the additional number of vehicle and bicycle trips generated by petitioner's development *reasonably relate* to the city's requirement for a dedication of the pedestrian/bicycle pathway easement." *Id.* at 395, 114 S.Ct. at 2321–22 (emphasis added). The Court concluded that while

> [t]he city's goals of reducing flooding hazards and traffic congestion, and providing for public greenways, are laudable ... there are outer limits to how this may be done. "A strong public desire to improve the public condition [will not] warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

under the Equal Protection Clause of the Fourteenth Amendment."). Indeed, the Court itself used the two terms interchangeably. *See id.* at 391, 395, 114 S.Ct. at 2319, 2321.

We are, however, presented with a potential conflict between state and federal law insofar as *Call II*, decided before *Nollan* and *Dolan*, appears to place the burden on the party challenging the dedication to show that it "had no reasonable relationship to the needs ... created by their subdivision," *Call II*, 614 P.2d at 1259, while *Dolan* places this burden on the entity of local government. *See Dolan*, 512 U.S. at 391 n. 8, 114 S.Ct. at 2320 n. 8 (While "in evaluating most generally applicable zoning regulations, the burden properly rests on the party challenging the regulation," the burden is on the government to "justify the required dedication" when it makes "an adjudicative decision to condition [an] application for a building permit on an individual parcel."). It must be noted, however, that the landowner in *Call II*, at the request of the city, paid a fee instead of actually conveying his property to the city, *Call I*, 606 P.2d at 218, so the cases are distinguishable on that basis. Additionally, in *Call v. City of West Jordan*, 727 P.2d 180 (1986) (*Call III*), the Court upheld a

trial court order which placed "the burden of producing evidence" regarding "the reasonableness of the impact fee" on the city. *Id.* at 182. In so doing, the Court indicated that *Call II* should be interpreted in light of the Court's subsequent decision in *Banberry Development Corp. v. South Jordan City*, 631 P.2d 899 (Utah 1981), which states:

> Since the information that must be used to assure that subdivision fees are within the standard of reasonableness is most accessible to the municipality, that body should disclose the basis of its calculations to whoever challenges the reasonableness of its subdivision or hookup fees. Once that is done, the burden of showing failure to comply with the constitutional standard of reasonableness in this matter is on the challengers.

*Id.* at 904. *See also Call III*, 727 P.2d at 181.

However, where the burden of proof ultimately falls should not affect the outcome here because, even if the burden properly rests on BAM, it has presented sufficient evidence that the County's dedication requirement does not have the requisite relationship—whether couched in terms of reasonableness or rough proportionality—to the impact of BAM's subdivision.

*Id.* at 396, 114 S.Ct. at 2322 (quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 416, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922)) (second alteration in original).

¶ 68 The justifications advanced in favor of the County's highway dedication requirements in this case suffer from the same shortcomings as those identified in *Dolan.* As acknowledged earlier in this opinion, the County's goal of "ensuring that community development occurs in accordance with sensible long-range transportation planning" qualifies as a legitimate public purpose. However, the County has not demonstrated why, in the interest of transportation planning, BAM must convey the right-of-way to the County outright, instead of, for example, implementing a set-back requirement that would prohibit BAM and similarly situated property owners from erecting structures that could complicate the future widening of 3500 South.

¶ 69 Similarly, the anticipated three to four percent increase in traffic congestion caused by the subdivision does not, by itself, justify the County's dedication requirement, which in essence requires BAM to pay for 100 percent of the cost of the County's long-range transportation goal of widening 3500 South, at least as to the portion of 3500 South that abuts BAM's property. Any argument the County makes to the contrary is fatally hobbled by its repeated assertions that "the County highway-dedication requirement operates independently of any unique characteristics or proposed uses of specific parcels to which it applies." While it is clear that the County employed such reasoning to convince the court that *Nollan* and *Dolan* do not apply to this case, it still leaves the County a "far cry" from the "individualized determination" required by *Dolan. Id.* at 391, 114 S.Ct. at 2319. *See* 1 Nichols, Emi-

nent Domain § 1.42[2], at 1–239 (3d ed. 2002) ("[W]here the need for a road is substantially generated by public traffic demands, rather than by the proposed development, eminent domain must be used rather than the police power.").[28] *Cf. Sparks v. Douglas County,* 127 Wash.2d 901, 904 P.2d 738, 741, 746 (1995) (upholding county dedication requirements where proposed development "would approximately double traffic" along adjacent streets).

¶ 70 Under *Dolan,* the County "must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Dolan,* 512 U.S. at 391, 114 S.Ct. at 2319–20. There appears to be no such evidence in the record before us. While it is agreed that community development and transportation planning are worthy goals, the County should not be permitted to implement these goals in an unconstitutional fashion by avoiding the compensation requirement.[29] "Rather, [the County] is free to advance its comprehensive program, if it wishes, by using its power of eminent domain for this public purpose, but if it wants [a right-of-way] across [BAM's] property, it must pay for it." *Nollan,* 483 U.S. at 842–43, 107 S.Ct. at 3151 (citations and quotations omitted).

## CONCLUSION

¶ 71 The County's exaction requiring dedication of a fifty-three-foot right-of-way along 3500 South Street constitutes a taking of BAM's property under both the Fifth Amendment of the United States Constitution and Article I, Section 22, of the Utah Constitution. BAM is entitled to just compensation for its property, and this court should reverse and remand for determination

**28.** Although *Dolan* does not *require* "precise mathematical calculation," it does not preclude a mathematical inquiry, and the Court in fact considered such evidence in *Dolan.* 512 U.S. at 391, 395, 114 S.Ct. at 2319, 2321. In any event, mathematical calculations, while not required, are at least one way to show an exaction is not roughly proportional to the impact of the proposed development. *See Art Piculell Group v. Clackamas County,* 142 Or.App. 327, 922 P.2d 1227, 1235 (1996) ("[*Dolan*] in fact requires

*some* quantification [and thus] such information, although not necessarily determinative, may be considered.") (emphasis in original).

**29.** It is acknowledged that the County may validly administer these goals via its dedication ordinance. Nevertheless, the County should not be permitted to short circuit the just compensation requirement by reading its ordinance to require landowners to dedicate their property for free.

of an appropriate award.[30] Such award should reflect unrebutted evidence that the County's dedication requirement caused BAM to lose two lots that it could have otherwise developed. *See, e.g.; City of Hildale v. Cooke,* 2001 UT 56,¶19, 28 P.3d 697 ("'[Land]owners must be put in as good a position money wise as they would have occupied had their property not been taken.'") (quoting *State v. Noble,* 6 Utah 2d 40, 43, 305 P.2d 495, 497 (1957)).

---

**30.** To the extent BAM has successfully persuaded me of the fundamental soundness of its position, that success should not be attributed, in any degree, to its counsel's unrestrained and unnecessary use of the bold, underline, and "all caps" functions of word processing or his repeated use of exclamation marks to emphasize points in his briefs. Nor are the briefs he filed in this case unique. Rather, BAM's counsel has regularly employed these devices in prior appeals to this court. While I appreciate a zealous advocate as much as anyone, such techniques, which really amount to a written form of shouting, are simply inappropriate in an appellate brief. It is counterproductive for counsel to litter his brief with burdensome material such as "WRONG! WRONG ANALYSIS! WRONG RESULT! WRONG! WRONG! WRONG!" It is also at odds with Rule 24(j) of the Utah Rules of Appellate Procedure.