Argued and submitted April 18, reversed and remanded with instructions
July 31, 1996

# ART PICULELL GROUP,
*Petitioner,*

*v.*

# CLACKAMAS COUNTY,
*Respondent.*

(LUBA No. 95-092; CA A92128)

922 P2d 1227

Jeff H. Bachrach argued the cause for petitioner. With him on the brief were Timothy V. Ramis, G. Frank Hammond and O'Donnell, Ramis, Crew, Corrigan & Bachrach.

Michael E. Judd, Chief Assistant County Counsel, argued the cause for respondent. With him on the brief was Clackamas County Counsel.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

DEITS, P. J.

## DEITS, P. J.

Petitioner applied to Clackamas County for approval of a subdivision. The county granted the application, subject to conditions, including the dedication and road improvement condition that is involved in this case. Petitioner appealed to LUBA, arguing that the condition violates the Takings Clause of the Fifth Amendment, as construed in *Dolan v. City of Tigard*, 512 US ___, 114 S Ct 2309, 129 L Ed 2d 304 (1994). LUBA affirmed. Petitioner seeks review, and we reverse.

Subject to supplementation as the context requires, we take the facts from LUBA's opinion:

> "Petitioner applied to the county for approval of a 19-lot subdivision bordering Summers Lane, a county maintained road. Eighteen of the lots are south of Summers Lane. Lot 19, at the west end of the proposed subdivision is north of Summers Lane. At that west end, Summers Lane traverses the proposed subdivision for approximately 130 feet. East and west of the proposed subdivision, Summers Lane is fully developed, or has been approved for full development, as a 60-foot right-of-way, with a 36-foot pavement width. Where Summers Lane borders the proposed subdivision, it is partially improved, with a 40-foot right-of-way.

> "The proposed subdivision is not dependent exclusively on Summers Lane for access. However, there is evidence that 81% of the traffic from the proposed subdivision will use Summers Lane. In addition, traffic from an adjoining subdivision will have access to Summers Lane through this subdivision development.

> "In approving the proposed subdivision, the county hearings officer originally required, as a condition of approval, full street improvement of Summers Lane (60-foot right-of-way and 36-foot pavement width) along the entire length of the subdivision, which would match the road's full development at either end of the subdivision. Petitioner appealed the imposition of that condition to LUBA. After the appeal was filed, the Supreme Court issued its decision in *Dolan v. City of Tigard*, [512] US ___, 114 S Ct 2309, 129 L Ed 2d 304 (1994). The county subsequently requested and was granted a voluntary remand to reconsider the challenged condition.

"After an additional hearing on remand, the hearings officer reapproved the subdivision, and modified the challenged condition [1A] to require a 10-foot property dedication and two-thirds street improvements along the eastern four-fifths of the subdivision (that portion which borders Summers Lane only on the south) and full street improvements along the western 130 feet of the proposed subdivision (that portion which is traversed by Summers Lane).

"Petitioner again appeals the imposition of that condition." (Footnote omitted.)

Petitioner argues that both the hearings officer and LUBA misapplied *Dolan*'s legal tests in a number of ways, and that, contrary to LUBA's holding, the hearings officer's findings failed to satisfy *Dolan*. We have, to some extent, provided an overview of *Dolan* in *Clark v. City of Albany*, 137 Or App 293, 904 P2d 185 (1995), *rev den* 322 Or 644 (1996), *J.C. Reeves Corp. v. Clackamas County*, 131 Or App 615, 887 P2d 360 (1994), and *Schultz v. City of Grants Pass*, 131 Or App 220, 884 P2d 569 (1994). Before turning to the specific issues presented in this case, we will again discuss *Dolan* generally.

■ *Dolan* deals with the question of when and whether a condition of development that affects a property interest in certain ways, and that a governmental body attaches to a developmental approval, constitutes a taking. To avoid being one, the condition must have an "essential nexus" to a legitimate governmental interest and must be related in its nature and extent to the impacts of the development. The test that *Dolan* establishes for that relationship is one of "rough proportionality" between the condition and the developmental impacts.[1] The rough proportionality test was chosen by the Court over the "reasonable relationship" test that had been followed in Oregon and many other jurisdictions, as well as other tests that were respectively more or less favorable than either the reasonable relationship or the rough proportionality test is to the party asserting a taking. We said in *J.C. Reeves Corp.* that "[t]he Supreme Court strongly indicated in

---

[1] There is no question here about the condition's connection with a legitimate governmental interest. Only the nature and extent of the relationship of the condition to the impacts is at issue. Further, as we understand petitioner's argument, its focus is on the "extent" aspect of the inquiry, and is concerned little if at all with the nature of the condition.

*Dolan* that it did not view the new 'rough proportionality' test to be a radical departure from the 'reasonable relationship' standard." 131 Or App at 620. Although petitioner here argues otherwise, we adhere to our view that the *legal* standard in *Dolan* does not differ sharply from the one that was previously applied in this state.

■ The next stage of *Dolan* is where significant departures from past practices *do* begin. First, it clearly places the "burden" of demonstrating rough proportionality on the governmental body imposing the condition, rather than leaving the burden on the applicant, although the burden is on the applicant in virtually all other contexts in the quasi-judicial land use decisional process. We noted in *J.C. Reeves Corp.*:

> "[A]lthough the [C]ourt spoke in terms of a 'burden' resting on the body imposing the conditions rather than on the applicant, the requirements for findings under Oregon's land use decisional scheme may often amount to the practical equivalent of a burden of articulation on local bodies that does not differ materially from what *Dolan* requires." 131 Or App at 620.

■ Although that statement is correct, as far as it goes, it needs some amplification. Findings of the traditional kind may serve as the *vehicle* for the governmental demonstration of rough proportionality but, when so used, they are not subject to the traditional standards for findings at either the local level or on review. Contrary to the usual purely adjudicative role of findings, *Dolan* effectively places the burden on the factfinder to articulate and substantiate the requisite facts and legal conclusion when, as here, findings are used as the device for the governmental demonstration and determination of rough proportionality.

■ The third feature of *Dolan*—its requirements concerning the specificity of the demonstration—is the most significant change from prior takings law. As we said in *J.C. Reeves Corp.*:

> "[*Dolan*] required considerable particularity in local government findings that are aimed at showing the relationship between a developmental condition and the impacts of development. * * *

> "The greatest obstacle that *Dolan* poses to the affirmability of * * * findings inheres in the specificity that it requires." 131 Or App at 618, 620.

The Court said in *Dolan* that "[n]o precise mathematical calculation is required," but there must be an "individualized determination" and "some effort to quantify [the] findings." 512 US at ___ , ___ , 114 S Ct at 2319, 2322. It is unclear where on the continuum the Court intended to locate the line between precise mathematical calculation and quantification, and the issues in this case do not require us to identify its exact location.

█ In addition to the foregoing overview of *Dolan*, a second preliminary matter requires discussion, *i.e.*, the manner by which we review LUBA's decisions in cases that are subject to *Dolan*. The question in such cases is whether the local decisionmaker has carried its burden of demonstrating "rough proportionality." Although there are substantial factual aspects involved in it, that question is ultimately one of law. *J.C. Reeves Corp.*, 131 Or App at 620. Accordingly, when faced with an assignment that LUBA erred by holding that a local government's findings do or do not establish rough proportionality, our analysis must eventually focus on the local findings themselves. That is not to say that an evaluation of LUBA's reasoning cannot be of assistance to us in answering the question. However, as with all legal questions that are presented to us in reviewing decisions by LUBA under ORS 197.850, the answer is for us to give, without applying any deferential review standard. *Reusser v. Washington County*, 122 Or App 33, 857 P2d 182, *rev den* 318 Or 60 (1993).

█ We return to the specifics of this case. The county hearings officer found, *inter alia*:

> "6. The cost to this developer from the requirements of Condition No. 1(a) relate potentially both to the requirement to dedicate land for public use and the actual costs of the required road improvements. As to the land dedication, the Hearings Officer notes that the preliminary plat proposes the dedication of 10 additional feet of right-of-way from the eastern boundary of the plat to the westerly terminus of the existing Summers Lane. Although this dedication is required by dedication [*sic*], it is proposed by the applicant. The additional required right-of-way dedication

does not impose any cost in terms of the development of this property. ZDO 1012 provides that the determination of allowed density shall not deduct more than 15 percent for roadways. Dedicated public roads within this plat, excluding Summers Lane dedications, account for at least 15 percent. The approved preliminary plat proposed to create 19 residential lots. The maximum number of lots permitted under the ZDO is 24. The required Master Plan for redevelopment of Lot 19 shows the creation of two additional lots. The difference between the lots proposed and the number permitted is accounted for by the two oversized lots which are currently improved with single family residences.

"There will be a cost to the developer for the required road improvements to Summers Lane. The applicant has submitted a cost estimate which is not very helpful, as it includes the projected [*sic*] for construction of Summers Lane to full collector street standards for its entire length through the subject property, which is not required by the conditions of approval, and it includes the construction and engineering costs related to domestic water, sanitary sewer and storm water facilities which would have to be constructed in any event, and are not attributable to the required roadway improvements. Using the applicant's figures, the required street construction to Summers Lane may be in the vicinity of $50,000, far less than the estimated cost of the water main, sanitary sewers and drainage facilities which will be constructed within the Summers Lane right-of-way to serve the subject property with these necessary public services.

"7. The impact of the proposed development and the benefit to this development from the required exactions are at least roughly proportional to this cost. This record establishes that the required improvements to Summers Lane are necessary to provide safe and convenient access to the subject property and to accommodate the additional traffic which will be generated by this development and others within this area. Completion of Summers Lane as an east-west collector street is necessary to accommodate additional development because of the existing congestion on the principal east-west roads in this area, particularly Sunnyside Road to the north and State Highway 211/212 to the south. Summers Lane can be completed only with the required dedication of additional right-of-way to connect other sections from the west. The extent to which Summers

Lane will be utilized by the future residents of this subdivision is demonstrated by the Metro Model which estimates that 81 percent of new traffic will utilize Summers Lane for east bound or west bound travel. The record further establishes that the required 2/3 street improvement for that portion of Summers Lane which abuts the subject property on one side only is the minimum improvement necessary to provide traffic safety for these users of Summers Lane. Other benefits which necessarily flow to the future residents of this development from the completion of Summers Lane as a collector street include the access of vehicles, bicyclists and pedestrians to the arterial road system serving this area of the County, significantly improved access for emergency vehicles to the subject property and its residents, and, of course, necessary public facilities, including water, sewer and storm drainage will be constructed within the right-of-way of Summers Lane.

"8. The applicant argues that the percentage of traffic utilizing Summers Lane generated by the 17 new lots now proposed is so small when compared to the total expected traffic that there is not a rough proportionality. The best estimates in this record are that 162 daily trips will be generated by the 17 new dwellings, and that as many as 5,000 vehicles may use Summers Lane on a daily basis. This type of mathematical analysis is specifically disapproved in *Dolan*. Furthermore it ignores the fact that the construction of Summers Lane at the subject property is necessary to provide a safe and convenient transportation network to serve the residents of this development. It also ignores the fact that the ZDO requires that all new development, including subdivisions, provide additional right-of-way and make road improvements as required to bring their road frontage to the road classification standard for their abutting road. The impact of this legislation is that road improvements and new road construction is provided by development as it occurs. The residents of this subdivision will utilize the road system constructed by other developments at no cost to these residents. The cost to any particular development, including this subdivision, may be high compared to its use of its specific section of a road, but it is clearly comparable to the cost of the system as a whole."

Petitioner argues, and the county conceded before LUBA and here, that the hearings officer's findings 6 and 7 are incorrect in stating that water, sanitary and drainage

facilities will be installed or delivered to the subdivision from the Summers Lane right-of-way.[2] Petitioner maintains that that mistaken finding, in itself, means that LUBA erred by holding that the county's findings succeed in demonstrating rough proportionality. The county responds that LUBA made no specific mention of the incorrect finding and, given that the county conceded that the finding was wrong, it is unlikely that LUBA considered it in holding that the findings as a whole were sufficient. LUBA said:

> "We need not determine whether each one of the county's findings independently could satisfy the rough proportionality test. Rather, we must determine whether cumulatively, the county's findings establish that there is a sufficient connection between the impacts of the development petitioner proposes and the dedication and frontage road improvements the county is requiring."

■ Although we agree with that statement as a generally correct approach to the application of *Dolan*, we also conclude that a single erroneous finding that plays a significant role in the governmental effort to show rough proportionality can be a basis in itself for reversing the governmental decision. That is the situation here. A form of "benefits versus burdens" analysis was central to the hearings officer's determination of rough proportionality and, in turn, the incorrect understanding about the location of the facilities was a significant consideration in two findings where the hearing officer applied the benefits versus burdens analysis. On its face, the mistaken finding about the location of the facilities was a prominent factor in the hearings officer's ultimate conclusion. A remand to the county is necessary to revise the pertinent findings, to reassess the rough proportionality determination in the light of its revised findings and to explain the rationale supporting its conclusion. In addition, a remand to the county is also necessary to allow it to revise or clarify its analysis relating to rough proportionality in the light of the discussion that follows.

---

[2] We use the term "findings" in two senses in our discussion. It refers in some instances to the hearings officer's specific factual determinations, and in others to the numbered paragraphs that contain the specific facts.

We next consider those other issues that petitioner raises that, in our view, are likely to arise in and influence the proceedings on remand. In addition to the finding that we have discussed, petitioner also questions the accuracy or correctness of certain other findings of the hearings officer. Although we will not discuss the purely *factual* aspects of petitioner's remaining arguments, we note that some specific findings, and perhaps the findings in general, may be affected by the *legal* issues that petitioner raises and that we will discuss.

Beyond its point that there was a factual error in the hearings officer's application of the benefits versus burdens analysis, petitioner also argues that it was legal error for the hearings officer to rely on that analysis at all in applying the rough proportionality test. Specifically, petitioner maintains that benefits in the form of road system improvements that the subdivision residents will share with the public at large "play no role in the *Dolan* test." Petitioner appears to acknowledge that we suggested otherwise in *Clark*, 137 Or App at 299, but contends that *Clark* allows consideration of benefits to the applicant's project only if it is the *sole* beneficiary of the condition. The county responds, correctly, that petitioner's all or nothing view is mistaken, and that the question is one of "degree," which turns on factual as much as legal determinants.

Our point in *Clark* was that certain approval conditions, although they involve dedications or are otherwise of a kind to which *Dolan* applies, can have the principal or overlapping effect of serving the needs of the development itself rather than, or as well as, offsetting impacts that the development will cause elsewhere. In some respects, to the extent that such conditions are for the use or benefit of the development, they play a role more similar to regulatory approval standards than *Dolan*-type conditions. Somewhat paradoxically, a good example of this is provided by the hearing officer's finding regarding the facilities in the Summers Lane right-of-way, had the finding been correct. The dedication and improvement requirement would serve the public generally, including incidentally the owners and inhabitants of the subdivision. However, if the facilities that would serve the subdivision were to be located where the hearings officer

found they would be, that would have constituted a discrete benefit to the subdivision, attributable in part to the dedication and improvement condition that would facilitate the placement of the facilities.

 It is probably impossible to formulate a universal rule concerning how "benefits" of that kind are to be factored into the rough proportionality calculus. Nonetheless, it is clear that, insofar as the facts of particular cases may indicate, conditions that in whole or in part serve the needs of the development itself should be weighed differently than pure "exactions" of the kind that serve only to mitigate an impact of the development on the public or public facilities. It also seems clear that the mix of "beneficial" and other conditions, as well as the mix of "beneficial" and other effects that may be attributable to a particular condition, can vary enormously from case to case. Given that, the absolute rule for which petitioner contends, that beneficial effects may only be considered if they are the *only* effects present, is not logically supportable.[3] Without deciding whether his application of the analysis was or was not correct in all of its particulars, we conclude that the hearings officer's consideration of "benefits" was not erroneous as an analytical approach. We emphasize, however, that that approach can be an appropriate *consideration* in *applying* the *Dolan* test, where the facts for it are present, but it should not be misunderstood as *being* the test.[4]

 Petitioner next contends that LUBA erred in upholding the hearings officer's treatment of certain evidence regarding the relationship between the required improvements and the subdivision's anticipated impacts. Petitioner presented evidence before the county that the development

---

[3] We indicated in *Clark* that a successful demonstration of rough proportionality could be anticipated if the development was shown to be the "sole or principal beneficiary" of the required improvements. *Id.* at 299. That does not imply that, where the nature of the condition or conditions in question does not approach that level, their beneficial characteristics cannot be *considered*.

[4] By using the parties' phrase "benefits versus burdens," we do not necessarily endorse it as the optimum way of formulating the issue or our conclusion. Terminology aside, the substance of our point is that the *Dolan* analysis allows consideration and appropriate weighing of whether and to what extent a condition serves needs of the development upon which it is imposed, as distinct from serving *only* general public needs in response to the public impacts of the development.

would account for only 2.6 percent of the traffic on Summers Lane. Petitioner argues that LUBA incorrectly concluded that that evidence was irrelevant. We do not agree that LUBA did so conclude. We agree, however, with some of the points that petitioner makes in connection with its argument.

■ The hearings officer *did* essentially treat the evidence as irrelevant, stating that "[t]his type of mathematical analysis is specifically disapproved in *Dolan*." We agree with petitioner, and have noted earlier, that *Dolan* states that precise mathematical calculations are not *required*, but it does not preclude them, and it in fact requires *some* quantification. Accordingly, such information, although not necessarily determinative, may be considered. The hearings officer was mistaken in his understanding and application of that particular of *Dolan*.

■ However, as mentioned above, LUBA did not conclude that the evidence was irrelevant. Rather, it held that the evidence was not dispositive, and it rejected what it understood to be petitioner's argument, *i.e.*, because the project would produce only 2.6 percent of the traffic on Summers Lane, petitioner "should have to contribute only 2.6 percent" of the improvements necessary to fulfill the county's plan of upgrading Summers Lane to collector street status. We agree with LUBA that *Dolan* does not have the effect of uniformly limiting road improvement conditions to an extent that correlates exactly with the traffic the development will generate, that there can be other kinds of developmental impacts that residential developments can have on street systems, and that *all* of the impacts appropriately enter into the analysis. *See J.C. Reeves Corp.*, 131 Or App at 622.[5]

■ Nevertheless, although LUBA did not duplicate the error, the hearings officer *did* err by treating petitioner's numerical evidence as irrelevant. Further, we agree with

---

[5] Petitioner contends that LUBA misunderstood its argument. Whether or not that is correct, it has no bearing on *our* disposition. We have already concluded that a remand is necessary. Our comments at this point are principally for guidance on remand.

petitioner's related point that it is the "government's burden," not petitioner's, to articulate the numerical and other facts necessary to demonstrate rough proportionality.

Finally, petitioner argues that the following passage from LUBA's opinion misapplies *Dolan*:

"Rough proportionality is more than a simple mathematical equation as to the number of cars generated by development. Rather, as we understand the Court of Appeals' explanation of the *Dolan* test as applied in *J.C. Reeves*, the 'comparison between the traffic and other effects of the subdivision and the subdivision frontage improvements that the county has required' is a mechanism to determine a developer's 'fair share of the total road cost.' The county is not required to artificially isolate proposed development. Rather, rough proportionality allows the county to consider the subdivision's real traffic impacts to the adjoining road generally in assessing the extent of frontage improvements necessary to alleviate the impact."

Relatedly, the hearings officer's order states:

"[The zoning ordinance] requires that all new development, including subdivisions, provide additional right-of-way and make road improvements as required to bring their road frontage to the road classification standard for their abutting road. The impact of this legislation is that road improvements and new road construction [are] provided by development as it occurs. The residents of this subdivision will utilize the road system constructed by other developments at no cost to these residents. The cost to any particular development, including this subdivision, may be high compared to its use of its specific section of a road, but it is clearly comparable to the cost of the system as a whole."[6]

Petitioner's principal target is the term "fair share" in the passage from LUBA's opinion. Petitioner points out that that term is akin to some of the variations of the stated standards for allocating improvement assessments among benefitted property owners, but it is not the appropriate standard for determining rough proportionality. The concern

---

[6] As we noted in *J.C. Reeves Corp.* and *Schultz*, the fact that a specific condition that, by its nature, is subject to the rough proportionality test is mandated by general local legislation does not alter the *Dolan* analysis in any way.

under *Dolan* is not with the apportionment of costs for a general improvement over the general body of benefitted property owners, but with the extent to which particular property may be burdened because of impacts that are attributable to its development.

■ Petitioner's understanding of *Dolan* is correct.[7] We do not imply that a development cannot have impacts that could warrant improvement conditions that are system wide in scope. However, contrary to the quoted statement of the hearings officer, the determinative factor must be the relationship between the impacts of the development and the approval conditions, and not the extent of the public's need for road or other improvements that happen to exist at the time the particular development is approved.[8]

Reversed and remanded with instructions to remand decision to county for further proceedings not inconsistent with this opinion.

---

[7] It is not clear to us whether LUBA's understanding differed, or whether "fair share" was simply an unfortunate word choice. It is clear, however, that the hearings officer's statement is contrary to *Dolan* in the way petitioner contends.

[8] Petitioner makes one further assignment. It requires no discussion.