Argued and submitted January 21, affirmed April 14, 2004

# HALLMARK INNS & RESORTS, INC.,
*Petitioner,*

*v.*

# CITY OF LAKE OSWEGO,
*Respondent.*

## 2002-049; A121798

88 P3d 284

Mary Ellen Page Farr argued the cause and filed the briefs for petitioner.

Evan P. Boone argued the cause for respondent. With him on the brief was David D. Powell.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

HASELTON, P. J.

## HASELTON, P. J.

This case is before us for a second time. *See Hallmark Inns & Resorts v. City of Lake Oswego*, 186 Or App 710, 65 P3d 300 (2003) (*Hallmark I*). Following our prior decision and remand, the Land Use Board of Appeals (LUBA) again upheld a decision of the City of Lake Oswego (city) that denied petitioner Hallmark Inns & Resorts, Inc.'s request that the city modify a development review permit issued in 1993 so as to eliminate any requirement that Hallmark provide a public pedestrian pathway across its property to connect a residential area on one side of the development to a shopping center on the other side.[1] Hallmark again petitions, arguing, *inter alia*, that, to the extent that the 1993 permit did, in fact, obligate Hallmark to dedicate a public pathway across its property, that requirement represented an unconstitutional taking of property under the analysis of *Dolan v. City of Tigard*, 512 US 374, 114 S Ct 2309, 129 L Ed 2d 304 (1994), and *Nollan v. California Coastal Comm.*, 483 US 825, 107 S Ct 3141, 97 L Ed 2d 677 (1987). We reject without discussion Hallmark's nonconstitutional arguments pertaining to the scope of the development condition and the consistency of the proposed modification with other development standards. For the reasons that follow, we conclude that the

---

[1] In our opinion in *Hallmark I*, 186 Or App at 712 n 2, we included for illustrative purposes the following diagram of the property, which was not drawn to scale:

dedication condition comported with the requirements prescribed in *Dolan* and *Nollan* and, consequently, affirm.

We take the material facts from our prior opinion:

"The development permit granted Hallmark's request for approval to construct its corporate headquarters. One of the several conditions attached to the approval, Condition B(2), required Hallmark, before the issuance of a city occupancy permit, to '[p]rovide easements for all public walkways/sidewalks and public utilities, including storm water retention and water quality facilities, to the satisfaction of [the] City Engineer.' The pathway at issue in this proceeding was constructed along the front of the company's building between Collins Way and Hallmark Drive. It was open to the public from early 1994 to mid-1996 when, due to vandalism, Hallmark constructed a fence at the western edge of the property at its connection to Collins Way. The fence cut off access to Hallmark's property from the west. After the fence was constructed, the city cited Hallmark for failing to comply with the condition requiring a public pathway. * * *

"This proceeding arises from Hallmark's request to the city in 1999 seeking a declaration that the condition requiring a public easement be deemed not applicable to the disputed pathway. Included in the application was an alternative request to modify the condition to remove the requirement of an easement. In October 2000, the city's Development Review Commission (the commission) denied the request for modification. The commission's order included a footnote reciting that the city manager was entitled to interpret the meaning and scope of approvals and further stated that the manager did not agree with Hallmark's assertion that no easement need be given for the pathway. The order concluded, *inter alia,* that the modification of the condition would violate portions of the development code controlling 'walkways' and 'accessways.'

"Hallmark appealed the commission's decision to the city council. The council affirmed the commission's decision. In so doing, the council said that there was substantial evidence in the record to show that Condition B(2) was designed to require a public easement over the pedestrian pathway. The city's findings added that, even if an easement had not been a specific condition of approval, the development approval included a requirement for public

pedestrian and bicycle access across the property. The city also found that a public need existed for the pathway and that the requirement was 'roughly proportional' to the impacts on the pedestrian and bicycle system created by the development of the property as a common campus and by the potential for more than 44 employees and customers working or doing business at the site. We understand that the latter conclusion was intended to answer Hallmark's claim that the easement, if required, was not proportional to the burdens occasioned by the development and, therefore, amounted to a taking of its property without just compensation under the Fifth Amendment to the United States Constitution under the theory announced in *Dolan*[.]"

*Hallmark I*, 186 Or App at 712-14 (footnote omitted).

Hallmark then appealed to LUBA, raising three principal arguments: (1) The disputed development Condition B(2) did not require dedication of any public pathway. (2) Modification of that condition to eliminate any such requirement would comport with, and not violate, other city development standards. (3) If development Condition B(2) did require dedication of the pathway, and if that requirement could not be eliminated consistently with other development standards, that requirement effected an unconstitutional taking of Hallmark's property under the Fifth Amendment to the United States Constitution. LUBA, in the decision that we reviewed in *Hallmark I*, held that Hallmark's first, "scope of the condition" argument was not properly before it because Hallmark had not specifically assigned error to the city's determination to the contrary. *Hallmark I*, 186 Or App at 715. However, LUBA addressed and rejected the merits of Hallmark's other two contentions. *Id.* at 714.

In *Hallmark I*, we concluded that LUBA had erred in declining to address Hallmark's threshold argument as to the scope of Condition B(2) because that matter was fairly encompassed within one of Hallmark's assignments of error before LUBA and its arguments in support of that assignment. 186 Or App at 717-18. Accordingly, because "a determination that Condition B(2) does not apply to the disputed

pathway * * * would render Hallmark's remaining challenges moot," *id.* at 716, we remanded to LUBA for reconsideration, declining to address LUBA's rejection of Hallmark's other arguments.

On remand, LUBA rejected Hallmark's "scope of condition" argument. In particular, LUBA concluded that substantial evidence in the record supported the city's determination that Condition B(2) required Hallmark to deed an easement for the pathway to the city, and that the requirement that Hallmark provide the easement was consistent with the city's ordinances.

Hallmark seeks judicial review once more. In addition to challenging LUBA's "scope of condition" holding, Hallmark renews its challenges to LUBA's original (and still extant) rejection of Hallmark's alternative arguments, which we deferred addressing pending remand in *Hallmark I*. Specifically, Hallmark asserts that LUBA erred in affirming the city's determinations that (1) modification of Condition B(2) so as to eliminate the pathway dedication requirement would violate certain development standards; and (2) the pathway dedication requirement did not effect an unconstitutional taking of Hallmark's property under the Fifth Amendment.

As noted above, we reject Hallmark's arguments as to the scope of development Condition B(2) and the propriety of the requested modification in light of other development standards. We proceed then, and limit our discussion, to various constitutional takings-related issues.

We note at the outset, before addressing the substance of Hallmark's takings-related arguments, that the city contends that Hallmark is estopped from raising those arguments. Specifically, invoking *L.A. Development v. City of Sherwood*, 159 Or App 125, 977 P2d 392, *rev den*, 329 Or 61 (1999), *cert den*, 528 US 1075 (2000), the city contends that, because Hallmark did not contest Condition B(2) when it was imposed and, instead, ostensibly accepted the condition without complaint and then proceeded to develop the property, its present challenge comes too late. *See id.* at 131 ("Here, plaintiff had legal remedies available, chose not to pursue them and, as a result, reaped benefits by not pursuing those remedies. Under similar circumstances, private parties have been

held estopped in their transactions when they have failed to avail themselves of potential remedies and as a result, received benefits.").[2]

We decline to consider the city's contention as unpreserved. The city did not assert estoppel, laches, or any related matter either in the local proceedings or before LUBA. *See* ORS 197.835(3) (in general, issues raised to LUBA "shall be limited to those raised by any participant before the local hearings body as provided by ORS 197.195 or ORS 197.763, whichever is applicable"). Although LUBA, *sua sponte*, appears to have raised the possible availability of estoppel, its footnoted treatment of that matter was parenthetical, and its observation that *L.A. Development* was distinguishable was *dictum*.

■ We turn to the merits on judicial review. As before the city and LUBA, Hallmark raises three principal arguments as to why Condition B(2) effected an unconstitutional taking when tested against the demands of *Dolan* and *Nollan*. First, Hallmark contends that the city failed to identify any legitimate government interest that would arguably be advanced by the dedication of the pathway. Second, in a related sense, Hallmark asserts that the city failed to establish the requisite "essential nexus" between the exaction of the pathway across its property and the public interest that that exaction was purportedly designed to promote. Finally, Hallmark asserts that, in all events, the city failed to establish "rough proportionality" between the pathway dedication condition and the reasonably projected impacts of the approved development.

In rejecting Hallmark's constitutional challenges and, generally, in denying Hallmark's application to eliminate the public access across its property, the city made several pertinent determinations. First, with respect to "legitimate governmental interest," the city emphasized that, through one of its ordinances, it had recognized the public

---

[2] *Accord* ORS 197.796 (permitting an applicant for a land use decision to comply with a condition of approval without waiving the right to challenge its constitutionality, but requiring the applicant to proceed with its challenge to the condition within 180 days).

need for pedestrian and bicycle access routes and connectivity.

The city further determined, with respect to "essential nexus," that the public pathway through Hallmark's property advanced the identified need for promoting connectivity for nonvehicular traffic. The city particularly determined that employees and those conducting business at the developed site would contribute to traffic in the city's transportation system and that the pathway would also serve the need for those persons to have access to shopping and neighborhood activity centers:

> "The Hallmark site has 9,726 square feet of office space and 44 parking spaces. * * * Assuming that only one employee or visitor occupies each car, up to 44 people can drive to the site. This does not include the people who walk, ride the bus or bike to the site. These people all contribute to the pedestrian traffic on the City's sidewalk and pathway system as those employees and customers either walk to nearby activity centers (post office, shopping, doctors offices) or leave for lunch breaks (at nearby restaurants or brown bag it in Waluga Park), or arrive or depart from the property for work or business reasons by using the public sidewalk system."

In a related sense, in assessing "rough proportionality," the city rejected Hallmark's argument that the impact of development should be measured not by the potential use of the site, but by the number of current employees working at the site, which was 17 rather than 44. In particular, the city observed that numerous uses of Hallmark's facility were permitted outright, including retail, restaurant, business, and medical and professional offices, and that a number of the permitted uses could be expected to generate high pedestrian, bicycle, and transit use. The city further found that

> "this large site, in comparison to other properties in the area, lies squarely in the path of the most direct route for pedestrians and bicyclists who wish to move from the retail area to the residential neighborhood and Waluga Park, and vice versa. The nature of the large parcel burdens the public pedestrian and bicycle systems by restricting movement and directing traffic over a large area."

(Footnote omitted.)

Finally, in assessing the proportionality between the pathway requirement and the impact of Hallmark's development of the site on pedestrian and bicycle traffic, the city noted that the Hallmark site encompassed six blocks and that, had the lots been developed separately, the city would have required a public pathway connecting the shopping center on one side to the neighborhood park on the other. The city further determined that the projected 44 users of the Hallmark site could be expected to use the public pathway system to gain access to the shopping center on one side of the site, and the public park on the other side of the site. The city concluded:

> "Even assuming arguendo that there will never be more than 17 employees in the building (which the Commission finds to be an unreasonable assumption), as compared to the estimated 50 residents along Collins Way, the imposition of 160 feet of accessway on the parcel, as contrasted to the 1250 feet of pedestrian facilities that the residents have contributed through dedicated right-of-way is roughly proportional. (To apply a strict mathematical analysis, each of the estimated 50 residents along Collins Way has contributed an average of 25 lineal feet to the pedestrian system; each of the 17 business employees on the Hallmark property has contributed an average of 9.4 lineal feet to the pedestrian system.) In point of fact, even at 17 employees, the employees are contributing *less* than the residential neighbors to the pedestrian system, not more. The Commission concludes that the current number of employees (17) is at the low end of the potential number of employees that may occupy the 9,726 square foot building, given the more employee-intensive uses permitted in the GC Zone to which the building could be utilized in the future. Therefore, when one considers the maximum number of employees possible to work on the property, the Commission concludes that the 160' accessway exaction for the *building development* clearly survives the rough proportionality requirements of *Dolan*."

(Emphasis in original; footnotes omitted.)

On appeal, LUBA rejected Hallmark's arguments that the pathway condition effected an unconstitutional taking under *Dolan*:

"[W]e agree with the city that there is a nexus between the requirement that petitioner grant an easement for access across its property and the city's policy regarding street connectivity, and that the exaction is roughly proportional to the impact the development has on the city's transportation system. The city determined that access across the subject property satisfied city requirements for connectivity, and presumably the city could have denied the application if that standard was not satisfied. We therefore conclude that there is a nexus between the exaction and the city's legitimate governmental interest in ensuring adequate transportation connectivity. * * *

"With respect to petitioner's argument that the city improperly based its requirement for pedestrian access on speculative future development, we disagree. We have held that a local government may consider those impacts that reasonably flow from the approval granted. *McClure v. City of Springfield,* 37 Or LUBA 759 [(2000)], *aff'd,* 175 Or App 425, 28 P3d 1222 [(2001), *rev den,* 334 Or 327 (2002)]. The city considered the impact that uses allowed on the property without further approvals would have on the pedestrian transit system and concluded that the building that is on the property could house up to 44 employees, at least some of whom would use the walkway to access Hallmark Drive or Collins Way. In addition, there are residents of the Waluga neighborhood who could patronize the building, now or in the future, and would access the building by walking or by bicycle. The city properly considered those impacts when it determined the extent of the impacts that justify the exaction.

"Finally, we agree with the city that the impact of the development of the subject property on the area's pedestrian and bicycle transportation system has been adequately quantified and establishes that the exaction is roughly proportional to the impact of the development. The findings * * * consider the types of uses in the vicinity and conclude that the development would impede access from the west to the subject property, to the transit stop on Hallmark Drive and to Mercantile Village. The findings also explain that persons who work at or patronize petitioner's business or businesses in Mercantile Village would be impeded from accessing Waluga Park, a neighborhood attraction that lies to the west of the subject property. At

least some of those persons could utilize the disputed walkway, and have used that walkway when it was open. In addition, the city finds that if the six individual lots were developed separately, the city would expect at least 360 feet of sidewalk to be provided for the public, and that petitioner's decision to combine the lots into one unitary development has impacts on the city's pedestrian system that the easement ameliorates. Given these findings, we conclude that the city has adequately quantified the impact and the exaction, and could conclude, based on that quantification, that the exaction is roughly proportional to the impact of petitioner's development."

(Citations to record omitted.)

We begin with Hallmark's argument that the city failed to identify a legitimate governmental interest that would be served by the dedication of the pathway. Specifically, although Hallmark does not dispute the abstract legitimacy of the city's interest in promoting connectivity and safe and convenient pedestrian and bicycle traffic access, Hallmark asserts that the city's reliance on that interest as justifying the pathway requirement cannot be reconciled with the fact that, in 1988, four years before the imposition of Condition B(2), the city had vacated the portion of Collins Way that had traversed the property in approximately the same location.

Like LUBA, we disagree that there is any necessary inconsistency between the city's actions in 1988 and 1992. Indeed, there is no inconsistency at all. First, in partially vacating Collins Way in 1988, the city acted in response to neighborhood residents' concerns about increasing volumes of, *inter alia*, motor vehicle traffic. Conversely, the pathway was, and is, limited to pedestrians and cyclists. Beyond that, circumstances differed over time. In 1988, the city was not confronted with addressing and mitigating the concrete traffic- and connectivity-related impacts generated by the proposed development; in 1992, it was. In short, vacating Collins Way in 1988 did not preclude the city from credibly identifying a legitimate governmental interest in assuring public access across the property at a later date.

Hallmark next argues that there was an insufficient "nexus" between the requirement of the dedication of the

pathway and the city's asserted interest. Before addressing the substance of that argument, a brief summary of the "essential nexus" concept, as developed and applied in *Nollan* and *Dolan*, is useful.

In *Nollan*, the local government, as a condition of development, required the applicants to dedicate an easement across the front of their beachfront lot to connect two public beaches. *Nollan*, 483 US at 828. The purported justification for that public easement condition was that it was imposed to advance the governmental interest in mitigating the "blockage of the view of the ocean" caused by construction of a house to be built on the applicants' property. *Id.* Ultimately, while the Supreme Court recognized that ocean view preservation was a legitimate state interest, it determined that there was no nexus between view preservation and a requirement of a frontage easement to allow members of the public to traverse the applicant's beach.

In *Dolan*, the city required the applicant to dedicate a portion of his property for flood control and traffic improvements. In contrast to *Nollan*, the Supreme Court in *Dolan* held that there was an "essential nexus" between those requirements and the legitimate state interests of preventing flooding and reducing traffic congestion. *Dolan*, 512 US at 387.

Hallmark asserts that this case is like *Nollan*, *viz.*, that there is, logically and practically, an inadequate relationship between the pathway condition and the interest in promoting connectivity and safe and convenient nonvehicular travel, which the city invokes as justifying that condition. In that regard, Hallmark argues that the city's pathway requirements are meant to implement administrative rules that provide that optimum trip length for cyclists and pedestrians is generally a quarter mile to a half mile, and points out that, even if pedestrians and cyclists were not able to use the 160-foot pathway through its property, they could still circumvent the property in less than half a mile. Thus, Hallmark reasons, because the optimum trip length standard would still be satisfied even without the pathway, the pathway condition cannot promote that interest.

With respect, Hallmark's argument misses the point. As the city explains:

"The trip length is the *entire* trip length, not just the distance to get around the Hallmark parcel. The distance of persons walking from Waluga Park to the commercial area, or vice versa, would be at or near the optimum trip length. Other residents in the surrounding residential area may also use the pathway, and when combining the distance from their residence to the site, it would exceed the optimum trip distance. In other words, because the class of pathway users is not finite, Hallmark cannot say what the length of the trip will be. By eliminating an obstacle, which adds considerable distance, the class of pedestrian users is larger."

(Emphasis in original.) We agree. Accordingly, as LUBA determined, the city adequately established an "essential nexus" between the pathway requirement and the legitimate governmental interest of promoting transportation connectivity and alternative modes of nonvehicular travel.

Finally, Hallmark contends that, in all events, the city failed to establish "rough proportionality" between the pathway condition and the projected impact of the development. *See Dolan*, 512 US at 388. In *Dolan*, the Court, while endorsing the "rough proportionality" formulation, explained:

"No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development."

*Id.*

Hallmark asserts that that requirement, as we have interpreted it in *J. C. Reeves Corp. v. Clackamas County*, 131 Or App 615, 887 P2d 360 (1994), and other cases, was not satisfied here. In particular, Hallmark disparages the city's "rough proportionality"-related findings as "conclusory" and "focused on speculative future uses and future occupants" of the development. Again, we disagree.

The city's findings were anything but "conclusory." Rather, those findings were presented in considerable detail,

were based on particularized projections, and included attempts to quantify the impact of the development on the city's transportation infrastructure. *See, e.g.,* 193 Or App at 31-32 (quoting findings). Given that, we understand Hallmark's challenge to be directed less to the specificity of the city's findings than to the premises of those findings.

In particular, Hallmark challenges the city's assessment of the impact the development will have on the transportation system based on the *projected* occupancy of the development, rather than on the *actual* level of use at the time Hallmark applied for the modification of the condition. Hallmark asserts that the city's findings are inadequate because there is no evidence in the record demonstrating that anyone in the development has ever used the pathway for access to the various community resources on either side of it, or that anyone in the community has actually used the pathway for access to the development itself.

Hallmark's challenge is based on an artificially and erroneously restrictive view of potential development impacts to be considered in the "rough proportionality" calculus. Under *Dolan,* the temporal benchmark for determining "rough proportionality," including assessing development-related impacts, is at the time the condition is imposed—or very shortly thereafter.[3] Given that, the inquiry is necessarily forward-looking; it properly considers reasonable projected impacts from permitted uses of the development, rather than being limited to impacts from a single permitted use. That is, "rough proportionality" is not restricted to considering the impacts of a single, particular use of the site when the development application, as approved, allows a *range* of uses reasonably generating a variety of impacts. The city council report on Hallmark's application for modification cogently explained that principle:

---

[3] As noted above, 193 Or App at 29, this case is unusual in that Hallmark has challenged the pathway dedication requirement several years after the development approval had occurred and Hallmark had, in fact, developed the property. That somewhat incongruous circumstance does not, however, alter the fundamental inquiry: Was the dedication requirement constitutionally *imposed* as a condition of development?

"[T]he pedestrian patterns are 'people-dependent' and will naturally change as the specific individuals change. For example, when a new residence is constructed, a sidewalk is required because the occupants statistically will utilize the sidewalk system at some time in the future. Although a homebound first owner of a residence will not use the pedestrian system in the neighborhood, when the residence is sold to a couple with 4 young children, they will extensively utilize the pedestrian system. Exaction of a sidewalk is not something that is temporal—imposed when one person moves in, removed when they move out. It is based on the expectation that over the life of the residence, occupants will statistically utilize the pedestrian system. The same is true with office buildings[.]"

A comparison of two of our cases further illustrates and corroborates that principle. In *Schultz v. City of Grants Pass*, 131 Or App 220, 884 P2d 569 (1994), the local government required roadway dedications as conditions of approving a partition application. The local government's justification for imposing that exaction was that the property in question might, upon further and future applications, be subdivided and that, in turn, might result in up to 20 homes being built on the site. Thus, the justification for the roadway dedications conditions was that those conditions would mitigate transportation impacts that could be generated if, at some point in the future, these sites were developed in a manner that was not yet permitted. Applying *Dolan*, we rejected that rationale:

"[T]he city's justification for the conditions is, in the words of the city's own supplemental findings, the impact of *'potential development* of the partitioned tract.' In other words, the city imagined a worst-case scenario—assuming that petitioners would, at some undefined point in the future, attempt to develop their land to its full development potential of as many as 20 subdivided residential lots, further assuming that petitioners would obtain all the necessary permits and approvals—and on the basis of that scenario, it calculated the impacts of the development and tailored conditions to address them."

*Schultz*, 131 Or App at 224 (emphasis in original).

Conversely, in *J. C. Reeves Corp.*, we rejected an applicant's argument that a certain condition of development

designed to alleviate an access problem to an adjoining lot was unconstitutional under *Dolan*. In that case, it was the applicant's "proposed use of its property [that caused] the access problem on the adjoining property." 131 Or App at 624. We stated:

> "In *Schultz* * * *, we concluded that it was impermissible under *Dolan* for the city to impose conditions that were linked to potential intensive future uses of property rather than to the more limited proposed use for which the owner was currently applying. Although part of the hearings officer's rationale for the condition here was based on the future development of the adjoining property, this case is not analogous to that aspect of *Schultz*. The present and future effects on access to the neighboring property that were the basis for the condition are the result of *this* proposed development of petitioner's property. Unlike the situation in *Schultz*, no further applications or development, with the concomitant opportunity for the county to consider further developmental conditions, need to occur or be presented in order for the proposed development to have the impacts on access that the [condition] is aimed at preventing."

*Id.* (emphasis in original).

The present case is more analogous to *J. C. Reeves Corp.* than to *Schultz*. The city's findings are based on the expected use of the facility that Hallmark applied to build and actually built, taking into account its size, the number of parking spaces it has, and the types of uses to which it may be put *without further applications or development.* The city's decision was not based on "potential development" of the sort at issue in *Schultz*. Rather, the city's "rough proportionality" calculus considered impacts from the development as actually approved.

Beyond that, we find Hallmark's narrow focus on the extent to which its current employees use the pathway to be misplaced. While the extent to which a condition actually benefits the property being developed is certainly a part of the "rough proportionality" assessment, it is not the only factor. *See Dolan*, 512 US at 391 (the "rough proportionality" inquiry concerns whether "the required dedication is related

both in nature and extent to the impact of the proposed development"); *Art Piculell Group v. Clackamas County*, 142 Or App 327, 336-37, 922 P2d 1227 (1996) (conditions may have overlapping effects of serving the needs of the development as well as offsetting impacts that the development will have on the community).

Here, the city's findings demonstrate that, without the pathway, the development would impede the flow of pedestrian and bicycle traffic from an adjoining residential area to an adjoining shopping center. The pathway removes that impediment. The need for the pathway is directly related to the development itself, and thus satisfies the "related in nature" aspect of the test. As to the "related in extent" inquiry, the city's findings indicate that the Hallmark development, which covers six lots, potentially contributes to the need for the pedestrian and bicycle transportation system at least as much as its neighbors, but actually has contributed *less* to the pedestrian and bicycle transportation system than its neighbors.

We have considered, and reject, Hallmark's remaining "rough proportionality"-related arguments. A published discussion of those arguments would not benefit the bench or bar. We thus conclude that LUBA correctly determined that the pathway dedication condition did not effect an unconstitutional taking of Hallmark's property.

We turn finally, and briefly, to the city's alleged "conditional cross-petition of appeal." The city asserts in its brief that it filed such a "conditional cross-petition of appeal" in this case and argues that, if we were to determine that LUBA erred, we should, nevertheless, remand to LUBA with directions that the case be remanded to the city for further consideration. Obviously, our disposition of Hallmark's appeal would moot any such "conditional cross-petition." But, even more fundamentally, our review of the appellate case file discloses that the city never, in fact, filed any such "cross-petition." Accordingly, we render no disposition of the "cross-petition."

Affirmed.